```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3    UNITED STATES OF AMERICA,

 4                    Plaintiff,           Case No. 11-20129
                                           Case No. 11-20066
 5       -v-

 6    SCOTT WILLIAM SUTHERLAND, D-1,
      PATRICK MICHAEL MCKEOUN, D-4,
 7    JEFF GARVIN SMITH, D-5/D-1,
      PAUL ANTHONY DARRAH, D-6/D-2,
 8    CARY DALE VANDIVER, D-7/D-5,
      VINCENT WITORT, D-8,
 9    DAVID RANDY DROZDOWSKI, D-17,

10                    Defendants.
      _____/
11
                     EXCERPT OF JURY TRIAL, VOLUME I
12
                BEFORE THE HONORABLE ROBERT H. CLELAND
13                  United States District Judge
              Theodore Levin United States Courthouse
14                  231 West Lafayette Boulevard
                         Detroit, Michigan
15                  Wednesday, October 15, 2014
      APPEARANCES:
16
      FOR THE PLAINTIFF:   SAIMA MOHSIN
17                         ERIC STRAUS
                           U.S. Attorney's Office
18                         211 W. Fort StreetSuite 2000
                           Detroit, MI  48226
19
                           JEROME MAIATICO
20                         United States Department of Justice
                           1301 New York Avenue, NW
21                         Washington, DC 20005

22    FOR THE DEFENDANT:   CRAIG A. DALY
                           (Sutherland, D-1)
23                         615 Ford Building
                           Suite 820
24                         Detroit, MI 48226

25
```

```
 1    APPEARANCES:            (Continued)

 2    FOR THE DEFENDANT:    SIDNEY KRAIZMAN
                            (McKeoun, D-4)
 3                          1616 Ford Building
                            Detroit, MI 48226
 4
                            JEROME SABBOTA
 5                          (Smith, D-5/D-1)
                            26862 Woodward Avenue
 6                          Suite 200
                            Royal Oak, MI 48067
 7

 8                          PATRICIA A. MACERONI
                            (Darrah, D-6/D-2)
 9                          26611 Woodward Avenue
                            Huntington Woods, MI 48070
10
                            MARK A. SATAWA
11                          (Vandiver, D-7/D-5)
                            3000 Town Center, Suite 1800
12                          Southfield, MI 48075

13                          KIMBERLY W. STOUT
                            (Witort, D-8)
14                          370 East Maple Road, Third Floor
                            Birmingham, MI 48009
15
                            BYRON H. PITTS
16                          535 Griswold, Suite 1630
                            Detroit, MI 48226-4218
17
                            PHILLIP D. COMORSKI
18                          535 Griswold
                            2632 Buhl Building
19                          Detroit, MI 48226

20                          RYAN H. MACHASIC
                            134 Market Street
21                          Mount Clemens, MI 48043

22

23            To Obtain a Certified Transcript Contact:
                            Christin E. Russell
24            RMR, FCRR, CRR, CSR - (248) 420-2720
                Proceedings produced by mechanical stenography.
25        Transcript produced by computer-aided Transcription.
```

```
 1                         I N D E X

 2
         JURY TRIAL, VOLUME I:                          PAGE
 3
         WITNESSES FOR THE GOVERNMENT:
 4       WILLIAM FLEMING
           Direct Examination by Ms. Mohsin               5
 5

 6                       E X H I B I T S

 7       Government Exhibit                             Page
         Exhibit 20-13, 20-15, 20-22, 20-18, 20-21       13
 8       Exhibit 63-9, 63-19, 64-33, 64-39               15
         Exhibit 63-9, 63-19, 64-33, 64-39               16
 9       Exhibit 21-2, 21-5, 21-9                         25
         Exhibit 22-2, 22-3                               31
10       Exhibit 24-23, 24-26, 23-1, 23-3                 37

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25       CERTIFICATE OF REPORTER                          43
```

```
 1   Detroit, Michigan

 2   September 18, 2013

 3   3:56 p.m.

 4                          *       *       *

 5            MS. MOHSIN:  Your Honor, the Government would call

 6   Special Agent William Fleming.

 7            (Witness is sworn.)

 8            THE COURT:  Have a seat right here.

 9            MS. MOHSIN:  Your Honor, I would like to advise the

10   Court that I have already advised the defense that this will be

11   one of many times that we call Special Agent Fleming to the

12   stand.

13            THE COURT:  Understood.

14            MS. MOHSIN:  Thank you.

15            THE COURT:  You may want to re-aim the microphone so

16   it's more towards you than sideways.

17            MS. MOHSIN:  Thank you, your Honor.

18            MS. MACERONI:  Your Honor, I don't want to interrupt,

19   but I don't know what that screen is right there, but I can't

20   see Mr. Fleming's face.

21            THE COURT:  Well, it's a monitor equivalent to that.

22   And that's what I have for the bench, as well.  And if you want

23   to reposition yourself temporarily, see if we can do something

24   about it later.  But we're going to proceed right now.  Go

25   ahead, Ms. Mohsin.
```

| | |
|---|---|
| 1 | MS. MOHSIN:  Your Honor, I've been advised to turn the |
| 2 | machine on, which if I could have a moment. |
| 3 | (Mr. Satawa present, 3:57 p.m.) |
| 4 | MS. MOHSIN:  May I, your Honor? |
| 5 | THE COURT:  Please. |
| 6 | WILLIAM FLEMING |
| 7 | called as a witness at 3:56 p.m., testified as follows: |
| 8 | DIRECT EXAMINATION |
| 9 | BY MS. MOHSIN: |
| 10 | Q.  Good afternoon. |
| 11 | A.  Hello. |
| 12 | Q.  Could you please tell the members of the jury your full |
| 13 | name, spell your last name, and tell them by whom you are |
| 14 | employed. |
| 15 | A.  It's William Fleming, F-L-E-M-I-N-G.  And I'm an agent with |
| 16 | the FBI.  And I'm currently assigned to the Macomb County |
| 17 | office. |
| 18 | Q.  And is your title special agent? |
| 19 | A.  It is.  That's an administrative title that defines our |
| 20 | position. |
| 21 | Q.  Special Agent Fleming, how long have you been employed by |
| 22 | the Federal Bureau of Investigation? |
| 23 | A.  A little over 27 years. |
| 24 | Q.  And during that time, how long were you employed or working |
| 25 | at the Macomb County office? |

```
 1   A.   I think I've been there now about 17 years.

 2   Q.   Do you have a particular area that you are assigned to?

 3   Any particular type of work that you do at the Macomb office?

 4   A.   Pretty much my entire career, I've worked gang

 5   investigations.

 6   Q.   And I want to direct your attention a moment to the time

 7   before you became a Federal agent.  What is your educational

 8   background?  Could you please tell the members of the jury?

 9   A.   I have a law degree.  And while I was in law school, I

10   worked as a police officer for a short period of time.

11   Q.   And when you say you have a law degree, you graduated from

12   law school?

13   A.   I did.

14   Q.   And what year was that?

15   A.   You're really testing my memory.  '83.  1983.

16   Q.   Okay.  Special Agent --

17   A.   No.  I'm sorry.  1987.

18   Q.   Okay.  Special Agent Fleming, during your time working with

19   the FBI, have you had occasion to participate in investigations

20   involving gangs that included, in other words, a number of

21   different types of gangs?

22   A.   I have.  I've been in two different field offices, and I've

23   worked all sorts of gang investigations, from Russian gangs to

24   Asian gangs, to your typical inner city gangs, and also

25   motorcycle clubs.
```

1  Q.  And when you say that you have investigated gang activity,

2  are there different types of activities that you have some

3  experience with?  For instance, does that activity include

4  violence and guns and drugs?

5  A.  Correct.  That's the main focus, is on those three areas.

6  Q.  During the course of your experience, as an agent and also

7  when you were a police officer, did you have occasion to ever

8  interview individuals who were involved in this type of

9  activity?

10  A.  I have.

11  Q.  And if you had to say, you know, or if you had to

12  approximate the number of people that you've talked to that

13  have been involved in this type of activity, how would you

14  approximate that?  Would it be in the dozens?  The hundreds?

15  A.  It would probably be in the thousands, would be my educated

16  guess.

17  Q.  I want to direct your attention now to an organization

18  called the Devils Diciples.  Are you familiar with that

19  organization?

20  A.  I am.

21  Q.  And I want to direct your attention to the time that you

22  were assigned to the Macomb County office.  Is that when you

23  became aware of the Devils Diciples?

24  A.  That's correct.

25  Q.  Tell the members of the jury, very briefly, some of your

2:11-cr-20066-RHC-MKM  Doc # 215  Filed 10/23/14  Pg 8 of 43  Pg ID 898
JURY TRIAL, VOLUME I - 10/15/2014
WILLIAM FLEMING - DIRECT

8

1   earlier -- some instances, you know, earlier in time where you

2   became aware of the Devils Diciples and some of the things that

3   brought them to your attention.

4   A.  Well, there had been an earlier investigation in

5   approximately 2004 that was conducted primarily by the ATF that

6   I was vaguely familiar with, although I didn't work on that

7   case at all.

8            In the same token, I also had some confidential

9   informants who were regularly providing me information on the

10  activities, at that time, of the Devils Diciples up in the Port

11  Huron area, and then down in what they called, it's, it's in

12  Clinton Township actually, but it's often called Mount Clemens.

13  Q.  Now, can you give us roughly a date when you first became

14  aware of the activities of the Devils Diciples, roughly what

15  year that was?

16  A.  It would have been late in 2004, probably September or

17  October of 2004.

18  Q.  And you indicated that there had been an earlier

19  investigation that involved the ATF; is that correct?

20  A.  That's correct.

21  Q.  And that's the -- what does ATF stand for?

22  A.  I'm sorry.  It's the Bureau of Alcohol, Tobacco and

23  Firearms.  It's another Federal law enforcement agency.

24  Q.  Were you personally involved in that investigation in any

25  way?

JURY TRIAL, VOLUME I - 10/15/2014
WILLIAM FLEMING - DIRECT                                                9

1    A.   I didn't -- no, I was not.

2    Q.   Was the FBI involved in that investigation?

3    A.   They were.  It was a joint investigation that ran out of

4    our office in Downtown Detroit.

5    Q.   So is that office a different office than your office in

6    Macomb County?

7    A.   That's correct.

8    Q.   So if -- so that we're perfectly clear, there is an FBI

9    office in Macomb County; is that accurate?

10   A.   That's correct.  And we cover Macomb, St. Clair, and

11   Sanilac County, and investigations in that area.  Our office in

12   Detroit covers Wayne County.

13   Q.   And is the Detroit office considered the headquarters for

14   this region?

15   A.   It is.

16   Q.   Now, I want to direct your attention to an individual by

17   the name of Victor Castano.  Are you familiar with that

18   individual?

19   A.   I am.

20   Q.   How did you become familiar with Victor Castano?

21   A.   Back in late 2004, I would frequently work with the St.

22   Clair County Drug Task Force.  And they made mention to me that

23   they had made an arrest of Mr. Castano and his girlfriend at

24   the time, Melissa Gordon; that they had seized a large amount

25   of marijuana, a firearm; and that their investigation showed

1    that Mr. Castano was a member of the Devils Diciples.

2    Q.  Now, once you received this information, what did you do

3    with the information?  What was your next step?

4    A.  Well, I talked to the local police and asked if they would

5    mind if we adopted the case federally, which basically says we

6    take their case and it becomes a federal prosecution in the

7    hopes of combining that with the information I was receiving

8    through sources, to see if, if there was a larger investigation

9    there related to the Devils Diciples.

10   Q.  Did that occur?

11   A.  Yes.  They turned the case over to us for federal

12   prosecution.  And that case went forward in early 2006.

13   Q.  Do you recall approximately when the Castano arrest

14   occurred by the local police?

15   A.  It was, I want to say some time in late September of 2004.

16   Q.  Okay.  And would something refresh your recollection

17   regarding when that would have, the arrest by the local police

18   would have occurred?

19   A.  It would.  A copy of the police report.  When I think about

20   it now, it may have actually been June or July of that year.

21   Q.  So would it be fair to say it was, as you sit here today,

22   not having recently reviewed the police report, sometime in

23   that time period, June, July?

24   A.  Earlier, that's correct.

25   Q.  2004?

1    A.  Correct.

2    Q.  And did the evidence that was seized in that case, what

3    happened to that evidence?  Withdrawn.

4         The evidence that the local police seized in that

5    case, what happened to that evidence?

6    A.  It was turned over to the FBI.

7    Q.  And did it eventually get turned over to your custody?

8    A.  It did.  Yes.

9    Q.  What did you do with that evidence?

10   A.  Well, the evidence was stored in our evidence room.  It had

11   already been analyzed and it just became FBI evidence.

12   Q.  And where is that evidence today?

13   A.  The evidence is in the FBI office in Detroit.

14   Q.  So it's still in the custody of the FBI; is that statement

15   correct?

16   A.  That's correct.

17   Q.  Now, specifically, a number of items were seized; is that

18   accurate?

19   A.  That's correct.

20   Q.  Did the local police also provide you with any photographs?

21   A.  They did.  They provided photographs.  The arrest occurred

22   during a traffic stop of a pickup truck that was being driven

23   by Mr. Castano.  They provided me photos of immediately after

24   the arrest.

25   Q.  And have you had an opportunity to review those photos

1    before you came here to court today?

2    A.  I have, yes.

3    Q.  And the photos that, that you had an opportunity to review,

4    can you just generally describe what types of photos they are?

5    A.  They show a black pickup truck with a large box in the

6    back.  It's actually a box for a grill.  They then show items

7    removed from that grill box, which turned out to be various

8    packaging of marijuana in one-pound packages.  And then it also

9    showed the interior of the pickup truck where a firearm was

10   located in the center console between the passenger and

11   driver's seat.

12   Q.  Okay.

13          THE COURT:  You've circulated these previously?

14          MS. MOHSIN:  They have been provided, your Honor.

15          THE COURT:  You're going to be moving these?  We can't

16   do this with every exhibit.  Why don't you identify these.  Are

17   you going to seek to identify these and admit them?

18          MS. MOHSIN:  I am going to seek to identify and admit

19   them, your Honor.

20          THE COURT:  What are the numbers?

21          MS. MOHSIN:  These are Exhibits 20-13, 20-15, 20-22,

22   20-18, 20-21.

23          THE COURT:  They've all been previously supplied to

24   counsel?

25          MS. MOHSIN:  Correct.

JURY TRIAL, VOLUME I - 10/15/2014
WILLIAM FLEMING - DIRECT

1          THE COURT:  Any objection?  Hearing none --

2          MS. STOUT:  No objection.

3          THE COURT:  -- admitted.  Okay.  Thank you.

4          The advantage of pre-circulating is we don't have to

5    do this every time one of these 10,000 exhibits is going to be

6    discussed or offered.

7          All right.  Go ahead.

8    BY MS. MOHSIN:

9    Q.  Special Agent Fleming, are those exhibits among the

10   photographs that you were provided by the local police?

11   A.  They are.

12          MS. MOHSIN:  Your Honor, the Government offers those

13   exhibits into evidence, 20-13, 15, 22, 18, and 21.

14          THE COURT:  Hearing no objection?

15          MS. STOUT:  No objection.

16          THE COURT:  I hear none.  They are each received.

17       (Exhibit 20-13, 20-15, 20-22, 20-18, 20-21 received,

18       4:08 p.m.)

19   BY MS. MOHSIN:

20   Q.  I'm going to direct your attention and the attention of the

21   jury to the screen.  Exhibit 20-13.

22          MS. MOHSIN:  We appear to be having a little -- there

23   we go.

24   BY MS. MOHSIN:

25   Q.  Can you please describe what is depicted in photograph

JURY TRIAL, VOLUME I - 10/15/2014
WILLIAM FLEMING - DIRECT

14

1   20-13?

2   A.   Sure.   Government Exhibit 20-13 is the rear of the pickup

3   truck that Mr. Castano and Ms. Gordon were driving in.   You see

4   a white and red grill box.   And contained inside that was

5   approximately 50 pounds of marijuana.

6          MS. MOHSIN:   20-15.

7   BY MS. MOHSIN:

8   Q.   Please describe that as well.

9   A.   Sure.   20-15 just shows the box, the grill box when it's

10  opened.   You see individual 1-pound Glad sandwich bags filled

11  with marijuana, and then a silver package of compressed

12  marijuana, which was about 14 pounds.

13  Q.   20-22?

14  A.   20-22 is just the evidence laid out, and a picture was

15  taken following the arrest.

16  Q.   20-18?

17  A.   20-18 is the center console of the car and a picture of the

18  firearm that was seized from the center console.

19  Q.   What type of firearm is that?

20  A.   It's a revolver.

21  Q.   Okay.   And 20-21.

22  A.   20-21 is just a photo of a Devils Diciple, what we would

23  call a patch or an emblem hanging from the rearview mirror.

24  Q.   Okay.   Thank you.

25          MS. MOHSIN:   Can you leave that up?

1    BY MS. MOHSIN:

2    Q.  Now, when you talk about an emblem, can you describe what

3    the emblem is?

4    A.  Sure.  It is a spoked wheel with two crossed tridents or

5    pitchforks, or whatever you'd like to call them.

6    Q.  Was the individual, Victor Castano, based on your

7    investigation, determined to be a member of the Devils Diciples

8    Motorcycle Club?

9    A.  He was, yes.

10          MS. MOHSIN:  You can take that photograph down.

11   BY MS. MOHSIN:

12   Q.  I'm going to show you 63-9, 63-19, 64-33 and 64-39.

13          Can you please identify what those photos are, based

14   upon their number?

15   A.  Sure.  63-9 is a photograph of Victor Castano.  63-19 is a

16   photograph of Vern Rich.  64-33 is a photograph of William

17   Lonsby.  And 64-39 is a photograph of Keith McFadden.

18          MS. MOHSIN:  Okay.  I offer these exhibits in

19   evidence, your Honor.

20          THE COURT:  Hearing -- I hear no objection.  There is

21   none.  They are received.

22      (Exhibit 63-9, 63-19, 64-33, 64-39 received, 4:12 p.m.)

23          MR. KRAIZMAN:  We don't have them.  I've got a disk,

24   Judge, with the exhibits on it.  It only goes to 63 dash

25   something.

1          THE COURT:  Well, they are proffered to be --

2          MR. KRAIZMAN:  62 dash something.

3          THE COURT:  Sorry.  That may need to be repaired.  But

4    for the moment, is there any actual objection to these facial

5    photographs?  You just want to see them?

6          MR. DALY:  Yeah.  We'd like to see them.

7          THE COURT:  Hold them up.

8          (Ms. Mohsin handing documents to defense counsel.)

9          (Brief pause.)

10         MR. MACHASIC:  No objection on behalf of Mr.

11   Drozdowski.

12         THE COURT:  Right.

13         MS. STOUT:  No objection, your Honor.

14         MR. SABBOTA:  No objection.

15         THE COURT:  Thank you.  Actually, I think it would be

16   more efficient to sound off in the event that there actually is

17   an objection, rather than having seven or eight no objections

18   stated at each such juncture.  I hear no objection and they are

19   received.

20      (Exhibit 63-9, 63-19, 64-33, 64-39 received, 4:13 p.m.)

21         MS. MOHSIN:  Thank you, your Honor.

22         Could you please publish 63-9?

23         THE COURT:  It's up on the screen, in other words,

24   right?

25         MS. MOHSIN:  Yes.  I will have to publish it, your

2:11-cr-20066-RHC-MKM   Doc # 215   Filed 10/23/14   Pg 17 of 43   Pg ID 907
JURY TRIAL, VOLUME I - 10/15/2014
WILLIAM FLEMING - DIRECT

17

```
 1   Honor.
 2            THE COURT:  All right.  You know, you could do it the
 3   old-fashioned way, just hold it up.  We have a little technical
 4   issue?  We have technical issues?
 5            MS. MOHSIN:  I will have to do that, but I'm not
 6   sure --
 7            MS. VAINIO:  The power button on the side of the ELMO.
 8   There you go.
 9            MS. MOHSIN:  Thank you.  I'll get it figured out.
10   BY MS. MOHSIN:
11   Q.  Can you please tell the members of the jury the individual
12   that's depicted in this photo?
13   A.  Sure.  That's Victor Castano.
14   Q.  Okay.  That was 63-9.
15            63-19?
16   A.  That's Vern Rich.  Williams Lonsby.
17   Q.  That's 63-33.
18   A.  And that's Keith McFadden.
19   Q.  Now, which individual was the one that was in the vehicle?
20   A.  Mr. Castano, the very first picture that you showed.
21   Q.  And there was a trial in this case; is that correct?
22   A.  That's correct.
23   Q.  Where was that trial?
24   A.  It was in the federal court up in Port Huron, Michigan.
25   Q.  Who was the judge?
```

JURY TRIAL, VOLUME I - 10/15/2014
WILLIAM FLEMING - DIRECT

18

1   A.   Judge Zatkoff.

2   Q.   And were you involved in that trial?

3   A.   I was, yes.

4   Q.   Were you the case agent for that case?

5   A.   I was.

6   Q.   So when someone is a case agent, what does that mean?

7   A.   The case agent is in charge of the investigation,

8   responsible for, if it goes to trial, helping the prosecution

9   handling whatever issues come up.

10  Q.   So when this case went to trial involving the evidence that

11  we showed earlier, the firearm and the drugs, did any of these

12  individuals testify?

13  A.   Of the pictures that you showed me, yes, Vern Rich

14  testified and William Lonsby.

15  Q.   Testified?

16  A.   Both testified.

17  Q.   And what about Mr. McFadden?

18  A.   And, I'm sorry, Mr. McFadden, too.

19  Q.   Now, there was a fourth individual as well.  Wasn't there a

20  female?

21  A.   There -- who testified?

22  Q.   Who testified.

23  A.   Yes.  Stella Herron.

24  Q.   Okay.  Her photo has not been displayed?

25  A.   It has not.

UNITED STATES vs. SUTHERLAND, et al. - 11-20129; 11-20066

2:11-cr-20066-RHC-MKM   Doc # 215   Filed 10/23/14   Pg 19 of 43   Pg ID 909
JURY TRIAL, VOLUME I - 10/15/2014
WILLIAM FLEMING - DIRECT

19

1    Q.   Okay.  And were you present during that trial?

2    A.   I was.

3    Q.   After you took the evidence, the drugs and the gun and

4    whatever else was provided, did you conduct any other

5    investigation in that case?

6    A.   We did.  Yes.

7    Q.   And did that investigation involve talking to people?

8    A.   It did.

9    Q.   Did, did individuals that you talked to include Keith

10   McFadden?

11   A.   It did eventually, yes.

12   Q.   Okay.  But not initially?

13   A.   Not initially, no.

14   Q.   So did you initially speak with who in the case?

15   A.   I spoke with Mr. Lonsby, Mr. Rich in attempting to

16   determine exactly the ownership of the truck and who had

17   provided the truck to Mr. Castano.

18   Q.   And eventually, you said you talked to Mr. McFadden.  How

19   did that come about, briefly?

20   A.   The defense advised us that Mr. McFadden was going to be a

21   defense witness during the trial.

22   Q.   And so you interviewed him in connection with that; is that

23   a fair statement?

24   A.   That's correct.

25   Q.   And did you also talk with Stella Herron?

1    A.   We talked to both of them.   Yes.

2    Q.   Okay.   Now, there was a trial in that case; is that right?

3    A.   There was.

4    Q.   What happened in that trial?   Was there a verdict?

5    A.   There was.

6    Q.   What was the jury's verdict in that case?

7    A.   The jury verdict -- Mr. Castano pled guilty to marijuana

8    charges before the trial, went to trial on the gun charges, and

9    was convicted.

10   Q.   He was convicted of what specifically?

11   A.   Use of a firearm during a drug trafficking crime.

12   Q.   Okay.   And how about, was there an additional charge

13   related to possession of firearms?

14   A.   Felon in possession of a firearm.

15   Q.   Okay.   Now, that case in 2004, how is that important in

16   this case, from the scheme of things of providing a historical

17   perspective of the case?

18   A.   Well, two ways.   First off, it gave us insight into the

19   involvement of the Devils Diciple inactivity up in Port Huron.

20        Secondly, we found out later on that there had been a

21   concerted effort to try and influence that case while it was in

22   trial by putting perjured testimony on the stand.

23   Q.   And did that occur, that determination or that information,

24   did that come much later?

25   A.   It did.   Three or four, maybe even five years later.

1  Q.  Okay.  So as of 2004 when Mr. Castano is arrested, that's

2  roughly when you first have an investigation involving a member

3  of the Devils Diciples; is that a fair statement?

4  A.  That's correct.

5  Q.  What happens next after that initial case?  Do you develop

6  any other cases involving members of the Devils Diciples?

7  A.  Shortly after the Castano case finished trial, I received

8  some information from my sources that members of the Devils

9  Diciples and some, what we would call "citizens," people who

10  aren't in the club, were involved in meth production in the New

11  Haven, Michigan area.

12  Q.  Now, I want to stop for a moment.  Did you have a RICO

13  investigation pending at that time?

14  A.  No.

15  Q.  Okay.  So this was just investigation into conduct of

16  various criminal activities; is that an accurate statement?

17  A.  That's correct.

18  Q.  And activities of individuals who happen to be involved in

19  this club?

20  A.  That's correct.

21  Q.  So you receive information.  And what do you do about it?

22  A.  We worked a lot of our cases jointly with the Michigan

23  State Police.  And we conducted a joint investigation with

24  their task force that's called COMET, which ultimately led to a

25  series of search warrants.

1    Q.   Now, what is COMET?   What is that an acronym for, if

2    anything?

3    A.   It's the County of Macomb Enforcement Team.   It's a drug

4    task force, basically.

5    Q.   Now, COMET and the Michigan State Police are working

6    together with you?

7    A.   That's correct.

8    Q.   And you indicated that search warrants were executed?

9    A.   They were.

10   Q.   How does one obtain a search warrant?

11   A.   A search warrant is obtained, after it's drafted and

12   approved by a prosecutor, it is taken to a judge.   And the

13   judge has to indicate that he believes there's probable cause

14   and authorize the warrant.

15   Q.   Probable cause in general, or specifically related to

16   something?

17   A.   Specifically related to the location where you want to

18   search, whether it's a car or a house or a person.

19   Q.   So if, if a special agent such as yourself were to seek a

20   search warrant before a judge, could it be any judge or a

21   particular judge?

22   A.   Well, it has to be related to, if it's a federal case that

23   I'm working on, it would have to go to a federal judge.   If it

24   was a state case, it would go to a state judge in the district

25   where you want to search.

JURY TRIAL, VOLUME I - 10/15/2014
WILLIAM FLEMING - DIRECT

1   Q.   And if it's an overlapping jurisdiction, could it go to

2   either?

3   A.   It could.

4   Q.   Now, in this case, a series of search warrants were

5   obtained; is that correct?

6   A.   A series of state search warrants, that's correct.

7   Q.   And those were sworn to by which type of officers?

8   A.   By a lieutenant from the Michigan State Police.

9   Q.   And so they were authorized by a state judge or judges?

10  A.   That's correct.

11  Q.   What types of locations did those warrants authorize the

12  search of?

13  A.   There were several houses that were searched.  There was

14  also two, what I'd call business or industrial-type locations.

15  And then after we had done the initial set of searches, it led

16  to search warrant back at the Devils Diciple clubhouse, again,

17  in Mount Clemens or Detroit, whichever you want to call it.

18  Q.   Let's start with the two industrial locations.  Did you

19  participate in the execution of those warrants?

20  A.   Not both of them, no.

21  Q.   Did you participate in the execution of any of those

22  warrants?

23  A.   I did at the one at the location, what we call the Lenfesty

24  location, which was in Harrison Township.

25  Q.   So that was one of the business locations you described?

1    A.   That's correct.

2    Q.   Okay.  And were you a part of that larger investigation

3    into these various locations that, that the Michigan State

4    Police had sought search warrants for?

5    A.   I was, yes.

6    Q.   When, when you say that there were several locations and

7    two were at industrial buildings, describe for me the one at

8    Lenfesty.  What type of building was it and what were you

9    searching for?

10   A.   It was a storefront inside an industrial complex, a series

11   of individual offices, for lack of a better word.  And the

12   information was that a meth lab was located in the location

13   that was owned and used by Mike Mastromatteo, who I knew was a

14   member of the Devils Diciples, who went by "Iron Mike."

15   Q.   And so his nickname was "Iron Mike"; is that correct?

16   A.   Correct.

17   Q.   And this shop, what was his relationship to it?

18   A.   He owned it and he repaired motorcycles and did other odd

19   mechanic work out of that location.

20   Q.   When you participated in the search warrant of this

21   location to search for a meth lab, did you find one?

22   A.   We did.  There was a meth lab that was up and actively

23   cooking meth at the time that we executed the search warrant.

24   Q.   Now, were photographs taken of that particular location?

25   A.   There were.

2:11-cr-20066-RHC-MKM   Doc # 215   Filed 10/23/14   Pg 25 of 43   Pg ID 915
JURY TRIAL, VOLUME I - 10/15/2014
WILLIAM FLEMING - DIRECT

25

1  Q.  And have you had an opportunity to examine some of those

2  photos before you testified here today?

3  A.  Yes, I have.

4  Q.  I'm going to direct your attention to Government Exhibit

5  21-2, 21-5 and 21-9.  Are those the photographs that you're

6  familiar with from that Lenfesty location?

7  A.  That's correct.  21-2, 21-5 and 21-9 are all photos of the

8  search warrant at Lenfesty.

9       MS. MOHSIN:  Your Honor, I would offer these for

10  admission.

11       THE COURT:  Do I hear any objection?  I hear none.

12  All right.  Each is received.

13     (Exhibit 21-2, 21-5, 21-9 received 4:23 p.m.)

14       MS. MOHSIN:  Thank you, your Honor.

15       Would you please publish 21-2?

16  BY MS. MOHSIN:

17  Q.  Would you please describe for the jury what's depicted in

18  this photograph.

19  A.  Sure.  21-2 is what's commonly referred to as a red P or a

20  red phosphorus meth lab.  It occupies the blue container, the

21  blue top container, with the gassing tubing running down to the

22  beaker that's inside a metal sink.

23  Q.  So the blue rubber container that's got the closed top on

24  top of it and the tube connected to it is what you're referring

25  to in that photograph?

1   A.   That's correct.

2   Q.   And the beaker that you're referring to is what's connected

3   to the hose?

4   A.   That's correct.  It's got a silver top to it.

5   Q.   Is that how it appeared when it was found inside of the

6   Lenfesty location?

7   A.   Yes.

8   Q.   And so was that photograph taken before anything was done

9   to dismantle that?

10  A.   That's correct.

11  Q.   What was determined to be inside of the beaker or the tub?

12  A.   Well, this was the components necessary to make meth using

13  the red phosphorus method.  And the beaker was tested and

14  contained red phosphorus.

15  Q.   Okay.  21-5.  Can you describe what's contained in that

16  photo?

17  A.   21-5, again, is the beaker that was inside the metal sink.

18  And it's on a hot pad or a hot, yeah, a hot pad.

19  Q.   A heating unit of some kind?

20  A.   There we go.  Yes.

21  Q.   Okay.  And again, is this a photograph taken before it's

22  dismantled?  In other words, as it appeared when you conducted

23  the search, or had something else been done before that photo

24  was taken?

25  A.   That's correct.  The photo was taken before the lab was

JURY TRIAL, VOLUME I - 10/15/2014
WILLIAM FLEMING - DIRECT

1    taken down.

2    Q.  And is that a close-up of the previous photo?

3    A.  It is, yes.

4    Q.  21-9.  Can you please describe for the members of the jury

5    what is depicted in this photo?

6    A.  21-9 is basically a Pyrex dish with a white powder

7    substance on it and a, some sort of scraping tool.

8    Q.  Okay.  And it's your understanding that that, too, is used in

9    the production of meth; is that an accurate statement?

10   A.  That's correct.

11   Q.  Okay.  You can take that down.

12         Now, you mentioned that this was on an address in

13   Lenfesty associated with "Iron Mike's" shop.  Were there a

14   number of other items also seized at that location?

15   A.  There were.

16   Q.  Okay.  Moving to continue with this somewhat bird's eye

17   view of this investigation, where was the other commercial

18   business located?

19   A.  It was, I believe it was on 26 Mile in New Haven.  It was a

20   business location that was rented by a Demetrius Meffer, who

21   went by "Demi."

22   Q.  And when you say that it was a commercial property, can you

23   roughly describe what it looked like?

24   A.  It was probably a building about half the size of this

25   courtroom.  It was an industrial, just an industrial building

JURY TRIAL, VOLUME I - 10/15/2014
WILLIAM FLEMING - DIRECT

1   with tools and machinery inside.

2   Q.  And were items related to meth manufacturing found inside

3   of that property as well?

4   A.  Meth precursors were found in that, inside that location.

5   Q.  You indicated that there were some homes searched as well.

6   Among those homes, were there any homes of a member of the

7   Devils Diciples?

8   A.  The clubhouse eventually was searched, but no other members

9   of the Devils Diciples house was searched.

10  Q.  Was there a search conducted at 8674 Anchor Bay Drive in

11  Algonac?

12  A.  There was at a later, later point in time.

13  Q.  Okay.  So not in connection with these original category of

14  searches?

15  A.  No, not originally.

16  Q.  All right.  What were the other locations that were

17  searched in that original category of searches?

18  A.  There were other locations that occupied or we had

19  information where meth manufacturing was being made.

20  Q.  And did you find meth labs?

21  A.  We found one other meth lab in a house on Twenty-four Mile

22  Road and we found items used to cook meth at all the other

23  locations.

24  Q.  Now, these other individuals, were they members of the

25  motorcycle club, the Devils Diciples, or were they associates

2:11-cr-20066-RHC-MKM   Doc # 215   Filed 10/23/14   Pg 29 of 43   Pg ID 919
JURY TRIAL, VOLUME I - 10/15/2014
WILLIAM FLEMING - DIRECT

29

1    or other people?

2    A.   They were other people at that time that, as far as we

3    knew, did not have a connection to the club.

4    Q.   Did that change over time?

5    A.   It did.

6    Q.   Okay.  Now, were there prosecutions based upon these

7    initial search warrants?

8    A.   There were.

9    Q.   Okay.  And did they involve RICO?

10   A.   It did not, no.

11   Q.   What type of prosecutions were they?

12   A.   There were prosecutions based on meth-related charges.

13   There were also some firearms charges.

14   Q.   Okay.  I want to direct your attention to a search warrant

15   that was conducted on 8674 Anchor Bay Drive.  You mentioned

16   that that occurred a little later.  Is that --

17   A.   Correct.

18   Q.   Okay.  Who was the member whose house that was, that was

19   searched?

20   A.   That was a member, Gregory Schoeninger, who was known by

21   the club name of "Breakdown."

22   Q.   And Gregory Schoeninger's house was searched.  Did you

23   participate in that search?

24   A.   Not that particular search, no.

25   Q.   Okay.  Did there come a time where you did participate in a

1  search of his home?

2  A.  There did, yes.

3  Q.  And when did that occur?

4  A.  In April of 2006.

5  Q.  All right.  So this was before April of 2006; is that

6  right?

7  A.  Correct.

8  Q.  Did you, did you take into custody evidence that was seized

9  from the earlier search warrant?  In other words --

10  A.  Eventually, it was turned over to us by the St. Clair

11  County Sheriff's Department, yes.

12  Q.  Okay.  And among the items that were seized, was there a

13  firearm?

14  A.  There was a firearm and other meth precursors.

15  Q.  Specifically, was there a meth precursor related to, or

16  items related to the manufacture of the red P method?

17  A.  There was.  There was a large tub filled with wooden stick

18  matches or -- that are commonly used in meth production.

19  Q.  Okay.  I'm going to show you an exhibit, 22-3.  Actually,

20  22-2 and 22-3.

21          MS. STOUT:  22-2 and 3, did you say?

22          MS. MOHSIN:  2 and 3.

23          MS. STOUT:  Thank you.

24  BY MS. MOHSIN:

25  Q.  Do you recognize those photos?

1   A.   I do.

2   Q.   What do they depict?

3   A.   22-2 was the firearm that was recovered from Mr.

4   Schoeninger's house.  And 22-3 is the large, looks like about

5   20 packages of matches, wood stick matches.

6           MS. MOHSIN:  Would you please -- excuse me.  I would

7   offer these in evidence, your Honor.

8           THE COURT:  Give me the numbers, please, again.

9           MS. MOHSIN:  22-2 and 22-3.

10          THE COURT:  Do I hear any objection?  I hear none.

11  22-2 and 22-3 are received.

12      (Exhibit 22-2, 22-3 received, 4:30 p.m.)

13          MS. MOHSIN:  Thank you, your Honor.

14          Could you please publish 22-2?

15  BY MS. MOHSIN:

16  Q.   Would you please describe what is depicted in that photo.

17  A.   That is the firearm that was located in Mr. Schoeninger's

18  house.

19  Q.   And do you know if that photograph was taken at the time

20  when the firearm was found?

21  A.   It was, yes.

22  Q.   What type of firearm is that?

23  A.   It's a revolver.  It was a .41 caliber.

24  Q.   Okay.

25          MS. MOHSIN:  Could you please publish 22-3?

JURY TRIAL, VOLUME I - 10/15/2014
WILLIAM FLEMING - DIRECT

32

1    BY MS. MOHSIN:

2    Q.  Could you please describe what's depicted in that photo?

3    A.  Sure.  22-3 is the tub of matches that we located.

4    Q.  Now, I want to pause for a moment and ask you what

5    significance those matches have.  But before I do that, I would

6    like to ask you some questions about your experience with

7    methamphetamine-related investigations.

8    A.  Sure.

9    Q.  Have you participated in investigations involving

10   methamphetamine?

11   A.  I have.

12   Q.  Have you received training about the methods that are used

13   in methamphetamine manufacturing?

14   A.  Generally, yes.

15   Q.  And as, as part of your training, have you learned to look

16   for certain things that are used in the manufacture of meth?

17   A.  Right.  We call them precursors.

18   Q.  So what is your understanding about the value of matches or

19   the use of matches when they are found in a bulk capacity, such

20   as this?

21   A.  These items are commonly used -- there are different ways

22   to produce meth.  These, the matchboxes with the strips on

23   them, that you strike the match on, those strips are valuable

24   in the red phosphorus method.

25   Q.  So your understanding is what, about those strips?

1    A.  That they are used in the method, the red P or red

2    phosphorus method of cooking meth.

3    Q.  And how is that done?  Are they physically removed from the

4    matches themselves?

5    A.  They are, yes.

6    Q.  Okay.  Thank you.

7         Now, around this same time, and I'm now focused around

8    the time of this search warrant, which was in approximately

9    what time frame, could you please tell the jury?

10   A.  I don't recall off the top of my head when exactly that

11   search warrant was done.

12   Q.  Okay.  It was prior to April of 2006?

13   A.  It was, yes.

14   Q.  And after March of 2005?

15   A.  It was.

16   Q.  Okay.  So during that time period, did you become aware of

17   additional activities by state and local police or others

18   involving members of the Devils Diciples?

19   A.  Well, at this point in time, we had started to see an

20   influx of information related to the Devils Diciples.  So we

21   started to do background investigation into identifying what

22   members were in the Devils Diciples, what their criminal

23   histories were, pulling police reports to see associations.

24   Kind of all the basic stuff we do at the beginning of an

25   investigation.

1   Q.  And when you indicate that other information was coming in,

2   did you get information about search warrants that had been

3   conducted at the -- at other members' homes?

4   A.  We did, yes.

5   Q.  Can you tell the jury a little bit about that?

6   A.  In regards to what time period?

7   Q.  March 11th of 2005 at Lapeer Road in Clyde Township.

8   A.  Okay.  This was a search warrant that was done a day after

9   the other search warrants, but it was unrelated to the COMET

10  investigation.

11          The St. Clair County Police -- Sheriff's Department

12  did a search warrant regarding stolen vehicles at the home of

13  Vern Rich, who was a member of the Devils Diciples.

14  Q.  Okay.  So you had earlier commented upon a series of search

15  warrants that you, yourself, participated in with the Michigan

16  State Police and COMET; is that correct?

17  A.  Correct.

18  Q.  This was not one of those search warrants?

19  A.  No.  Although it was the next day, it was completely

20  unrelated.

21  Q.  But it came to your attention?

22  A.  They had called me and said that they were going to execute

23  a search warrant and asked if I would come along.

24  Q.  So were you present when that warrant was executed?

25  A.  I was.

2:11-cr-20066-RHC-MKM   Doc # 215   Filed 10/23/14   Pg 35 of 43   Pg ID 925
JURY TRIAL, VOLUME I - 10/15/2014
WILLIAM FLEMING - DIRECT

35

1   Q.   And it was at the home of a member of the Devils Diciples?

2   A.   Vern Rich, who was a member, at that time was the president

3   of the Port Huron chapter.

4   Q.   Now, you previously testified a short time ago and

5   identified a photograph of Vern Rich.  Is that the same Vern

6   Rich whose house was searched?

7   A.   That's correct.

8   Q.   And so at the time that the search warrant -- withdrawn.

9        Around that same time, you also said that a search of

10  the clubhouse occurred?

11  A.   Early, on the morning of March 11th, based upon information

12  that had been recovered in the other COMET searches, another

13  search warrant was obtained for the clubhouse, the Devils

14  Diciples clubhouse.

15  Q.   Let's talk about that a little bit.  Where is that

16  clubhouse located?

17  A.   It's located on Gratiot, south of Hall Road on the west

18  side.  It's a large blue framed house, back off the road.

19  Q.   And when you say on Gratiot, south of Hall Road, what, what

20  locality is that?  What --

21  A.   It's Clinton Township.

22  Q.   So it's physically located in Clinton Township?

23  A.   Correct.

24  Q.   And it's called the Mount Clemens clubhouse?

25  A.   It's called, yeah, Mount Clemens or Detroit.  They are

1    pretty much interchangable.

2    Q.  And what's the basis of that?  How do you know that?

3    A.  Interviews with various people affiliated with the Devils

4    Diciples.

5    Q.  So based upon the results of the search warrants that you

6    had -- that had been conducted earlier, a search warrant was

7    executed at the Mount Clemens clubhouse; is that accurate?

8    A.  That's correct.

9    Q.  Okay.  Have you had an opportunity to examine the

10   photographs or -- I should withdraw it.

11          Were photographs taken of both the Vern Rich and the

12   Mount Clemens clubhouse search warrants on March 11th of 2005?

13   A.  There were, yes.

14   Q.  Okay.  And have you had an opportunity to examine those

15   photographs?

16   A.  Yes, I have.

17   Q.  All right.  I'm going to show you some additional

18   photographs.  24-23, 24-26, 23 -- excuse me.  23-1 and 23-3.

19          MS. STOUT:  23-1?

20          MS. MOHSIN:  And 23-3.

21          MS. STOUT:  23-3 and 24?

22          MR. SATAWA:  23 and 26.

23          MS. STOUT:  Thank you.

24   BY MS. MOHSIN:

25   Q.  Would you please identify what's contained in each of those

1    photographs by, and refer to them by exhibit number?

2    A.  Sure.  24-23 is a photo of a firearm that was found at Vern

3    Rich's house.  24-26 is a photo of marijuana that was found at

4    Vern Rich's house.  23-1 is a photo of the bar area of the club

5    -- Devils Diciples clubhouse on Gratiot.  And 23-3 is a

6    photograph of two firearms that were found underneath the bar

7    at the Devils Diciples clubhouse.

8            MS. MOHSIN:  Your Honor, I offer these exhibits in

9    evidence, 24-23, 24-26, 23-1 and 23-3.

10           THE COURT:  Do I hear any objection?

11           I do not.  And each is received.

12      (Exhibit 24-23, 24-26, 23-1, 23-3 received, 4:38 p.m.)

13           THE COURT:  Go ahead.

14           MS. MOHSIN:  Would you please publish 24-23?

15   BY MS. MOHSIN:

16   Q.  Would you please describe what is depicted in that photo

17   for the benefit of the jury?

18   A.  Sure.  That is the photo of one of the firearms recovered

19   at Vern Rich's house, along with some ammunition.

20   Q.  You said one of the photos -- "one of the firearms."  Were

21   there, in fact, additional firearms found?

22   A.  There were long guns, rifles or shotguns.

23           MS. MOHSIN:  Okay.  Would you please show 24-26?

24   BY MS. MOHSIN:

25   Q.  Could you please describe that?

2:11-cr-20066-RHC-MKM  Doc # 215  Filed 10/23/14  Pg 38 of 43  Pg ID 928
JURY TRIAL, VOLUME I - 10/15/2014
WILLIAM FLEMING - DIRECT

38

```
 1   A.  Sure.  That's some marijuana that was found at Vern Rich's
 2   house.
 3          MS. MOHSIN:  Okay.  23-21.  Would you please publish?
 4          THE COURT:  23-1?
 5          MS. MOHSIN:  I apologize.  23-1.  I misstated the
 6   number.  Thank you, your Honor.
 7   BY MS. MOHSIN:
 8   Q.  Would you please describe what's depicted in that photo?
 9   A.  Sure.  That's a photo of the bar area of the Detroit or
10   Mount Clemens clubhouse for the Devils Diciples.
11   Q.  And can you be specific as to what is depicted, you know,
12   in various areas of that photo?
13   A.  Well, you've got the bar area.  And in the back of the
14   photo, you have various slot machines, a money bill changer,
15   and then different memorabilia, Devils Diciple memorabilia.
16   Q.  On the bar itself, are there leather vests depicted?
17   A.  There are.
18   Q.  And what, what are those commonly referred to?
19   A.  Colors.
20   Q.  And when you say they are referred to colors, what are they
21   referring -- when you say "colors," what are you referring to
22   specifically?  Is it the vest or the items on it?
23   A.  It is the vest that is worn by members of a particular
24   motorcycle club, they are called "colors."
25   Q.  And is there specific patches that are contained on those
```

JURY TRIAL, VOLUME I - 10/15/2014
WILLIAM FLEMING - DIRECT

39

1   vests?

2   A.   Each club has got their own patches or designs that they

3   wear on the vest, and then various other patches for attending

4   various functions.

5   Q.   Is the vest that's depicted here in this photograph one of

6   the colors of the Devils Diciples?

7   A.   It is.  It looks like it's a prospect vest.  It does not

8   have the full colors on it yet.  You don't get those until

9   you're a full member.

10   Q.   Okay.  And we'll talk a little bit more about that later.

11        Now, you indicated that, as a result of these search

12   warrants and other information you had received, you commenced

13   an investigation; is that a fair statement?

14   A.   Yes.

15   Q.   What occurred next?  After all of this evidence was seized,

16   were there additional prosecutions of members, such as

17   Schoeninger?

18   A.   There were.  There -- both Gregory Schoeninger, who went by

19   "Breakdown" and Michael Mastromatteo, who went by "Iron Mike"

20   were prosecuted along with other people on various federal drug

21   or firearms charges.

22   Q.   And when you talk about Gregory Schoeninger, what was he

23   charged with?  Was he charged with RICO?

24   A.   He was not.  He was charged as a felon in possession of a

25   firearm and then possession of methamphetamine.

1    Q.  When you would talk about the felon in possession of

2    firearms, are you referring to the firearm that was depicted in

3    the photograph that we showed to the jury a short time ago,

4    Exhibit 22-2?

5    A.  That's correct.  The silver revolver.

6    Q.  And was there a jury trial in that case?

7    A.  There was.

8    Q.  And was that jury trial in federal court?

9    A.  It was.

10   Q.  And where was that?

11   A.  Here in this building.

12   Q.  Here in this building.  Did that result in a verdict?

13   A.  It did.

14   Q.  Okay.  And what happened in that case?

15   A.  He was found guilty of the charges.

16   Q.  And during the course of that investigation and that trial,

17   did you investigate any obstruction of justice charges?

18   A.  We did.  It came to our attention that a threat had been

19   made against one of our -- one of the witnesses in the case,

20   and that also an attempt was made to obtain perjured testimony

21   from a potential witness.

22   Q.  Okay.  Now, you had mentioned Michael Mastromatteo, "Iron

23   Mike."  We had showed photos of that Lenfesty shop.  Was that

24   his shop?

25   A.  It was.

1  Q.  And you indicated he had been prosecuted.  Was he convicted

2  also after that prosecution?

3  A.  He was.

4  Q.  Okay.

5          THE COURT:  We're ready to recess, if you want to wrap

6  up any particular topic in a minute or so.

7          MS. MOHSIN:  Thank you, your Honor.  Just a few more

8  follow-up questions.

9          THE COURT:  Okay.

10 BY MS. MOHSIN:

11 Q.  Mr. Mastromatteo, when you say that, that he was convicted

12 as well, was that for RICO or for something else?

13 A.  No.  It was on meth production and manufacturing charges.

14 Q.  All right.

15         MS. MOHSIN:  Your Honor, I think this would be a good

16 place to stop.

17         THE COURT:  May I note to the -- thank you.

18         May I note to the jury there is a chart containing a

19 large number of possible exhibits, some of which are going to

20 be introduced.  I imagine, if this trial is like every other

21 trial I've seen, some of them will be introduced, some of them

22 will not.

23         My expectation is that a pared-down chart of the

24 admitted exhibits will be created and made available for

25 counsel and for the jury near the conclusion of the case?

1        MS. MOHSIN:  Yes, your Honor.

2        THE COURT:  And so you'll -- the numbers and so forth,

3   you might be jotting down if you wish to reference them later.

4   Ladies and gentlemen, we don't have a chart for you just yet,

5   the Government doesn't, but something like that will be

6   produced later.

7        We have nothing else to do in court this afternoon.

8   And I will release you in just a few moments to go back into

9   the jury room, to be escorted off the floor, as you were

10  yesterday.  And we'll have you line up tomorrow reporting to --

11  well, through the ordinary administrative procedure, whatever

12  it is you've been told to do, do it again, this morning.

13       And We'll be ready to go, parties and witnesses and so

14  forth here, ready to open court, my plan is, 9 a.m.  And we'll

15  proceed then tomorrow on a partial day tomorrow, I believe,

16  ending at about one, perhaps 1:15.  And have a pleasant

17  evening.  And no discussion of the case, as before, a constant

18  reminder that I'll give you.  Thank you for your attention

19  today.  You may rise and be excused.  Go ahead.

20    (Jury out, 4:45 p.m.)

21

22                    *            *            *

23

24

25

1               **CERTIFICATE OF REPORTER**

2

3           As a Federal Official Court Reporter for the United

4    States District Court, appointed pursuant to provisions

5    of Title 28, United States Code, Section 753, I do hereby

6    certify that the foregoing is a correct transcript of

7    the proceedings in the above-entitled cause on the date

8    hereinbefore set forth.

9

10

11                       Dated this 15th day of October, 2014.

12

13                        s/ Christin E. Russell
                         Christin E. Russell
14                       RMR, CRR, FCRR, CSR
                         Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25