```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
 2                       SOUTHERN DIVISION

 3    UNITED STATES OF AMERICA

 4                      Plaintiff.
             v.                          Case No. 11-20129
 5                                       Case No. 11-20066

 6   SCOTT WILLIAM SUTHERLAND, D-1,
     PATRICK MICHAEL MCKEOUN, D-4,
 7   JEFF GARVIN SMITH, D-5,
     PAUL ANTHONY DARRAH, D-6/D-2,
 8   CARY DALE VANDIVER, D-7/D-5,
     VINCENT WITORT, D-8,
 9   DAVID RANDY DROSZDOWSKI, D-17,

10                      Defendants.
     _____/

11
                JURY TRIAL - VOLUME XXVIII - PART A
12
             BEFORE THE HONORABLE ROBERT H. CLELAND
13                 United States District Judge
             Theodore Levin United States Courthouse
14                 231 West Lafayette Street
                    Detroit, Michigan 48226
15                 Thursday, December 11, 2014

16   APPEARANCES:

17   FOR THE PLAINTIFF:   SAIMA MOHSIN
                          ERIC STRAUS
18                        U.S. Attorney's Office
                          211 W. Fort Street
19                        Detroit, MI 48226

20                        JEROME MAIATICO
                          U.S. Department of Justice
21                        1301 New York Avenue, NW
                          Washington, DC 20005
22
     FOR THE DEFENDANT:   CRAIG A. DALY
23                        (Sutherland, D-1)
                          615 Ford Building
24                        Suite 820
                          Detroit, MI 48226
25
```

```
 1   APPEARANCES:         (continued)

 2   FOR THE DEFENDANT:   SIDNEY KRAIZMAN
                          (McKeoun, D-4)
 3                        1616 Ford Building
                          Detroit, MI 48226
 4
                          JEROME SABBOTA
 5                        (Smith, D-5/D-1)
                          26862 Woodward Avenue
 6                        Suite 200
                          Royal Oak, MI 48067
 7
                          PATRICIA A. MACERONI
 8                        (Darrah, D-6/D-2)
                          26611 Woodward Avenue
 9                        Huntington Woods, MI 48070

10                        MARK A. SATAWA
                          (Vandiver, D-7/D-5)
11                        3000 Town Center, Suite 1800
                          Southfield, MI 48075
12
                          KIMBERLY W. STOUT
13                        (Witort, D-8)
                          370 East Maple Road, Third Floor
14                        Birmingham, MI 48009

15                        BYRON H. PITTS
                          535 Griswold, Suite 1630
16                        Detroit, MI 48226

17                        PHILLIP D. COMORSKI
                          535 Griswold
18                        2632 Buhl Building
                          Detroit, MI 48226
19
                          RYAN H. MACHASIC
20                        (Drowzdowski, D-17)
                          134 Market Street
21                        Mount Clemens, MI 48043

22

23        To Obtain a Certified Transcript Contact:
                          Carol S. Sapala
24              RMR, FCRR, CSR (313)961-7552
          Proceedings produced by mechanical stenography.
25   Transcript produced by computer-aided transcription.
```

Usa v Sutherland, et al 11-20129; 11-20066

1

2                              I N D E X

3        _____

4    JURY TRIAL, VOLUME XVI                              PAGE

5

6    WITNESSES FOR THE GOVERNMENT:

7

8    LORI MADAY (continuing

9    Cross Examination by Mr. Maschiac (cont.)        6
     Redirect Examination by Mr. Straus              31
10

11   CHRIS ADAMS

12   Direct Examination by Mr. Straus                38
     Cross Examination by Ms. Maceroni               48
13   Redirect Examination by Mr. Straus              57

14
     LILLIAN GEORGE
15
     Direct Examination by Ms. Mohsin                62
16

17

18   Certificate of Court Reporter                   86

19

20

21

22

23

24

25

              Usa v Sutherland, et al 11-20129; 11-20066

```
 1

 2

 3                    E X H I B I T S

 4

 5        _____

 6    IDENTIFICATION                          PAGE

 7

 8    Government Exhibit 11-33                  79

 9    Government Exhibit 11-34                  79

10    Government Exhibit 11-36                  79

11    Government Exhibit 11-38 thru 42          79

12    Government Exhibit 11-52                  79

13    Government Exhibit 11-54                  79

14    Government Exhibit 11-55                  79

15    Government Exhibit 11-57                  79

16    Government Exhibit 11-58 thru 65          79

17    Government Exhibit 11-67-68               79

18    Government Exhibit 70-78                  79

19

20

21    Defense Exhibit 13                        25

22

23

24

25
```

1  Detroit, Michigan

2  December 11, 2014

3  9:09 a.m.

4                    *          *          *

5             (Call to Order of the Court; all

6             parties present)

7             THE CLERK:  Calling case number 11-20066 and

8  11-20219, United States versus Scott Sutherland, *et al.*

9             THE COURT:  Morning to counsel and parties.

10 Everyone is seated.  Jury's now here and all seated.

11 Parties and counsel may be seated.  I will note the

12 presence of all defendants and all attorneys as well.

13    Good morning to the members of the jury.

14             JURORS:  Morning.

15             THE COURT:  And we will, at your request that

16 I received through staff we'll recess a little bit early

17 this afternoon 4:15, perhaps even a little bit earlier

18 then that.

19    People have outside activities I understand to

20 attend, some people do.  So we'll run on that sort of

21 schedule, please, counsel.

22    All right.  Then for presentation, this morning,

23 Mr. Straus?

24             MR. STRAUS:  I believe it would be cross

25 examination of Ms. Maday.

Jury Trial Vol. XXVIII - 12/11/14
Lori Maday-Cross Exam/Mr. Machasic (cont.)

1          THE COURT:  You have her present?  All right.

2          (Whereupon the witness resumed the stand

3           and testified further as follows)

4          THE COURT:  Good morning, ma'am.  Please have

5    a seat.  You understand your oath continues from

6    yesterday.

7          THE WITNESS:  Yes.

8          THE COURT:  All right.  And any additional

9    questions, Mr. Machasic?

10         MR. MACHASIC:  Thank you.  Judge.

11              CROSS EXAMINATION (continuing)

12   BY MR. MACHASIC:

13   Q    Good morning, Ms. Maday.  How are you?

14   A    Good.

15   Q    I just have a few follow up questions based on the

16   government's direct examination of you.

17         THE COURT:  You might want to bend that

18   microphone so that it the tip of it more like that.  I

19   think it's sort of -- it's directional.

20         So go ahead, sir.

21   BY MR. MACHASIC:

22   Q    Is this better?

23         Can you hear me better, Ms. Maday?

24   A    Yes.

25   Q    I'm going to ask you a little bit about the timing

                    Jury Trial Vol. XXVIII - 12/11/14
                 Lori Maday-Cross Exam/Mr. Machasic (cont.)

1    of things.

2         And that is, was it in 2010, was it August or

3    September about that time, late Summer, that you met

4    Mr. Drozdowski?

5    A    Yes.

6    Q    It was at Clem's Pourhouse?

7    A    Yes.

8    Q    Where's Clem's Pourhouse?

9    A    696 and Van Dyke.

10   Q    That's a bar?

11   A    It was, yes.

12   Q    Was it a biker bar?

13   A    They were known to be there, yes.

14   Q    Okay.  And at the time Dave was living on Anchor

15   Bay Drive?

16   A    He moved to Anchor Bay Drive.  He was first staying

17   on, I believe, it was Fruit or some kind of road within

18   that vicinity.

19   Q    Okay.  So sometime shortly after you met, though,

20   he moved to Anchor Bay; is that my understanding?

21   A    Yes.

22   Q    He moved in with "Lurch"?

23   A    Yes.

24   Q    "Lurch" was a Vigilante, right?

25   A    Correct.

                 Usa v Sutherland, et al 11-20129; 11-20066

                    Jury Trial Vol. XXVIII - 12/11/14
                    Lori Maday-Cross Exam/Mr. Machasic (cont.)

1   Q     Not a Devil's Diciples?

2   A     No.

3   Q     And "Lurch" was like a good friend of Dave's or --

4   A     I believe there was some form of cousins.

5   Q     Cousins?  All right.

6         Do you know if they were just like close and they

7   called each other 'cuz or --

8   A     Probably.  I couldn't say for sure.

9   Q     Okay.  And then you moved in with Dave about late

10  2011 onto Maurice?

11  A     Yes.

12  Q     Okay.  And between Lurch's place -- so the place on

13  Anchor Bay and Maurice, that's when you lived with,

14  briefly, April and SA?

15  A     Yes.

16  Q     Now during that time with  April and SA, you said

17  Dave was making methamphetamine in a shed?

18  A     Uh-huh.

19  Q     Okay.  Not in April and SA's house, in a shed.

20  Correct?

21  A     Uh-huh.

22            THE COURT:  You need to say more than uh-huh.

23            THE WITNESS:  Yes.

24            THE COURT:  Thank you.

25            THE WITNESS:  Yes.

                    Jury Trial Vol. XXVIII - 12/11/14
                 Lori Maday-Cross Exam/Mr. Machasic (cont.)

1               MR. MACHASIC:  Thank you, Ms. Maday.

2    BY MR. MACHASIC:

3    Q     You would stay in the house with April, right?

4    A     Yes.

5    Q     And with the kids, right?

6    A     Yes.

7    Q     Now at the Anchor Bay Drive address, Dave, a couple

8    times, made meth there, right?

9    A     Uh-huh.  Yes.

10   Q     Now before leaving Anchor Bay Drive, "Lurch" had

11   already move out, right?

12   A     Yes.

13   Q     And he moved out because Dave wasn't holding up his

14   end of the bargain, not paying any of the bills or

15   contributing to the rent?

16   A     Yes.

17   Q     And that was because Dave was pretty much always

18   broke, right?

19   A     Yes.

20   Q     And I can't think of a more delicate term.

21         So he was kind of a mooch?

22   A     Yes.

23   Q     You paid the bills?

24   A     I'm sorry?

25   Q     You paid the bills, right?

                 Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII - 12/11/14
Lori Maday-Cross Exam/Mr. Machasic (cont.)

1    A    I -- yes.

2    Q    Okay.  And at some point, Dave got a motorcycle,

3    right?

4    A    Yes.

5    Q    And in the end, you ended up paying for that

6    motorcycle, right?

7    A    Yes.

8    Q    Okay.  Now, also in 2011, there was a time where

9    Dave went back to work as a Mason, right?

10   A    Correct.

11   Q    Okay.  From maybe Spring to November or whenever

12   the season would stop for masonry?

13   A    Yes.

14   Q    And he was working with Tony and NC Cement?

15   A    Yes.

16   Q    And even during that time, you still pretty much

17   had to contribute the vast majority towards --

18   A    Yes.

19   Q    -- all the bills?

20   A    Yes.

21   Q    Okay.  In fact, Dave was even behind in his club

22   dues, right?

23   A    Yes.

24   Q    Now the -- so you go into Maurice.

25        And then at Maurice, Dave's also making meth in the

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII - 12/11/14
Lori Maday-Cross Exam/Mr. Machasic (cont.)

1  shed, right?

2  A    Yes.

3  Q    Now at the Maurice address when the FBI came in and

4  executed the search warrant, they found ammunition.

5       Do you recall that?

6  A    Yes.

7  Q    Okay.  And that was in a box up on a shelf, like a

8  moving box?

9  A    It was on the shelf, top shelf in the back.  I had

10 unloaded it from the box when we moved in.

11 Q    Okay.  And so these were in boxes that you had

12 moved from -- had come with you along from Anchor Bay

13 Drive?

14 A    Correct.

15 Q    And in that box, those were actually Lurch's things

16 contained within that box, right?

17 A    Yes.

18 Q    And so the ammo, the ammunition, was actually

19 Lurch's ammunition, right?

20 A    My understanding, yes.

21 Q    Okay.  They were like size 13 shoes or boots in

22 that box?

23 A    Yes.

24 Q    Do you recall?

25      And David Drozdowski does not wear size 13 shoes,

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII - 12/11/14
Lori Maday-Cross Exam/Mr. Machasic (cont.)

1    does he?

2    A    No.

3    Q    Also, when they came in and executed the search

4    warrant, they took the motorcycle that was in the shed,

5    right?

6    A    Correct.

7    Q    So they went in the shed and they took the

8    motorcycle?

9    A    Correct.

10   Q    And they kept it?

11   A    Yes.

12   Q    Okay.  By the way, that motorcycle had -- did you

13   and/or Dave name it?

14   A    Yes.

15   Q    And was that motorcycle named Rose?

16   A    Yes.

17   Q    That was after you, correct?

18   A    Yes.

19   Q    Now over the course of knowing Dave, beginning your

20   relationship with him, he started using or was using

21   meth when you first met him, right?

22   A    Yes.

23   Q    You were attracted to him because this was -- this

24   was back at Clem's Pourhouse.

25        He was kind of edgy, right?

          Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII - 12/11/14
Lori Maday-Cross Exam/Mr. Machasic (cont.)

1   A    Yes.

2   Q    He had tattoos?

3   A    Yes.

4   Q    Kind of -- kind of the bad boy look?

5   A    Yes.

6   Q    Okay.  And I think you said he was your chase?

7   A    Yes.

8   Q    And so you actually you pursued --

9   A    Yes.

10  Q    -- Mr. Drozdowski?

11  A    Yes.

12  Q    Eventually, you established a relationship, started

13  dating and had been together?

14  A    Yes.

15  Q    Your parents live in the area, right?

16  A    They live in Michigan.

17  Q    Okay.  And you actually moved stuff from your

18  family home when you moved in with Dave, correct?

19  A    Yes.

20  Q    Okay.  Now over the course of time, your Meth habit

21  increased, right?

22  A    Correct.

23  Q    And Dave's did as well, correct?

24  A    Correct.

25  Q    And you and Dave, you were using more and more Meth

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII - 12/11/14
Lori Maday-Cross Exam/Mr. Machasic (cont.)

1   as time progressed, yes?

2   A    Yes.

3   Q    And to the point where, I mean, Dave would use Meth

4   any chance he got.

5        If he could get his hands on it, he would use Meth,

6   right?

7   A    Yes.

8   Q    It became so bad, he would stay up for two or three

9   days at a time on Meth, constantly taking Meth, keeping

10  his high, right?

11  A    Yes.

12  Q    Now you talked about seeing I think this was at

13  Chad's house?

14  A    Correct.

15  Q    They would go out in the garage and they make Meth.

16       And you saw a coffee filter being brought in; do

17  you recall that?

18  A    Yes.

19  Q    They would -- once they brought that in, Chad and

20  Dave actually shared what they had made, right?

21  A    Correct.

22  Q    They would sit around and use it.

23       They would get high?

24  A    Correct.

25  Q    So they would go out away from you, make that Meth,

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII - 12/11/14
Lori Maday-Cross Exam/Mr. Machasic (cont.)

1   and they'd come in and party get high?

2   A    Correct.

3   Q    What was the delivery method?  How did you two use

4   Meth?

5   A    Snorted it.

6   Q    Snorted it?

7   A    Yes.

8   Q    Okay.  Did you put that on a mirror or on spoon?

9   How do you snort Meth?

10  A    On a mirror or using your thumb.

11  Q    Your thumb?

12       After Anchor Bay you moved to SA and April's.

13       And that was for a brief period of time, only for a

14  couple of months?

15  A    Correct.

16  Q    And this was SA and April, April Sykes?

17  A    Correct.

18  Q    And April was kind of a Drama Queen, I guess, is

19  the best word?

20  A    Correct.

21  Q    And she would exaggerate blow things up and kind of

22  try to start conflict, right?

23  A    Correct.

24  Q    This wasn't just one time, this was pretty much her

25  M.O. the way that she operated?

Usa v Sutherland, et al 11-20129; 11-20066

1    A    Correct.

2    Q    It was the April show, 24/7, right?

3    A    Correct.

4    Q    And you got out of that -- April's house.

5         And you and Dave went got your place on Maurice,

6    right?

7    A    Correct.

8    Q    Now Dave would not just use Meth at home, right?

9    A    Correct.

10   Q    He would actually go out and party?

11   A    Correct.

12   Q    Okay.  And in the beginning, he would party with

13   people at work at Clem's, right?

14   A    Uh-huh.

15   Q    You would use Meth with those people.  Yes?

16   A    Yes.

17   Q    And he would party with you.

18        You guys would use Meth.  Yes?

19   A    Correct.

20   Q    And he would party at the club.

21        And you said that he would use Meth at the club as

22   well, right?

23   A    Correct.

24   Q    And at the club when Dave would use Meth or you

25   would use Meth, you wouldn't go pick a table and start

Jury Trial Vol. XXVIII - 12/11/14
Lori Maday-Cross Exam/Mr. Machasic (cont.)

1   lining up lines of Meth or putting them on mirrors out

2   in the open on a table, right?

3   A    No.

4   Q    You would actually go in the back, kind of hide it

5   from whoever was around, right?

6   A    Correct.

7   Q    So you would use it discreetly?

8   A    Correct.

9   Q    Now if you're using it a home, you could just go

10  put it on the coffee table and do it that way, right?

11  A    Correct.

12       MR. MACHASIC:  You've seen Dave holding his

13  fingers -- for the record, I'm holding up both of my

14  hands with all but my thumbs sticking out.

15  BY MR. MACHASIC:

16  Q    So the 44 sign?

17  A    Correct.

18  Q    And that stood for DD, correct?

19  A    Correct.

20  Q    Devil's Diciples?

21  A    Yes.

22  Q    Now you said D talked about or Mr. Drozdowski

23  talked about the DDMC a lot, right?

24  A    Yes.

25  Q    He would discuss what was going on with you, right?

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII - 12/11/14
Lori Maday-Cross Exam/Mr. Machasic (cont.)

1    A    Yes.

2    Q    Okay.  And you've been at the club house, right?

3    A    Yes.

4    Q    You know who several people are, right?

5    A    Yes.

6    Q    And I think you described it as a dysfunctional

7    club?

8    A    Yes.

9    Q    Not everybody got along in the Devil's Diciples,

10   did they?

11   A    No.

12   Q    Okay.  It was kind of like a -- for lack of a

13   better term, what you would think of like a middle

14   school lunch room.

15        You had one table with this group, another table

16   with this group.

17        And you can't sit at my table and I'm not sitting

18   at your table?

19   A    Yes.  Sounds right.

20   Q    That's about right?

21   A    Uh-huh.

22   Q    That's the best analogy?

23   A    That's all right.

24   Q    These club members, this was not one cohesive club

25   doing all the same thing all in lock step.

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII - 12/11/14
Lori Maday-Cross Exam/Mr. Machasic (cont.)

1    These were different groups in that club, different

2  people doing different things?

3  A    That was my understanding, yes.

4  Q    And D even more.

5    I mean, he would -- he just did whatever he wanted,

6  right?

7  A    Yes.

8  Q    Okay.  Doesn't listen to anybody, right?

9  A    No.

10  Q    Takes his -- I think it's the expression keeps his

11  own counsel?

12  A    Yes.

13  Q    Now at a certain point -- how long were you on

14  Maurice, by the way?  I'm sorry.

15  A    It was shortly after January 2012 that we moved

16  out.

17  Q    Okay.  And when you moved out, you moved in with

18  Dave's sister, right?

19  A    Correct.

20  Q    And you were there for a few months, right?

21  A    Correct.

22  Q    Okay.  And the plan was to actually -- for you and

23  Dave to move closer to -- is it Auburn Hills?

24  A    Yes.

25  Q    Because at the time you were working at Chrysler,

Jury Trial Vol. XXVIII - 12/11/14
Lori Maday-Cross Exam/Mr. Machasic (cont.)

1  right?

2  A    Yes.

3  Q    So the plan was to kind of leave the east side and

4  go -- you and Dave go find a place in Auburn Hills

5  somewhere?

6  A    Yes.

7  Q    Because that was closer to your work, right?

8  A    Correct.

9  Q    And his sister lives -- is it New Baltimore?

10 A    Correct.

11 Q    That's a long drive for you to get to work?

12 A    Yes.

13 Q    And that's what really mattered, because you were

14 the one providing money for the couple, right?

15 A    Correct.

16 Q    You now at some point -- let's go back to Maurice

17 and the search warrant.

18      The FBI came in with the search warrant.  Yes?

19 A    Correct.

20 Q    They presented it to you and they seized several

21 items, right?

22 A    Yes.

23 Q    They went in the shed and out of the shed they

24 seized the motorcycle that you had purchased?

25 A    Yes.

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII - 12/11/14
Lori Maday-Cross Exam/Mr. Machasic (cont.)

1    Q    And a bunch of other stuff, right?

2         Boxes, mirrors, ammunition, all of that stuff?

3    A    Yes.

4    Q    That was a pretty unpleasant experience for you, I

5    imagine?

6    A    Yes.

7    Q    They didn't come in and knock and say we have a

8    search warrant, we'd like to come in.  Did they?

9    A    No.

10   Q    They actually bust in and -- I mean it's pretty

11   intimidating when the FBI comes in the early morning

12   hours and just starts you sit here, you sit here.

13        Here's what we're here for.  Right?

14   A    Yes.

15   Q    Okay.  Now that wasn't your last contact with the

16   FBI in that respect, was it?

17   A    No.

18   Q    They came to your work, correct?

19   A    Correct.

20   Q    Okay.  And they came to your work for what purpose?

21   A    To talk with me.

22   Q    To talk with?

23        And that, that scared you a bit, didn't it --

24   A    Absolutely.

25   Q    -- when they showed up at your place of work.

Usa v Sutherland, et al 11-20129; 11-20066

                    Jury Trial Vol. XXVIII - 12/11/14
                    Lori Maday-Cross Exam/Mr. Machasic (cont.)

1   A      Absolutely.

2   Q      They were demanding information, correct?

3   A      Absolutely.

4   Q      And that scared you when the FBI shows up at your

5   work with all of your colleagues around?

6   A      Yes.

7   Q      And then, again, you moved into an apartment later

8   on, right?

9   A      Yes.

10  Q      In Berkley?

11  A      That's current.  I was in Lake Orion before that.

12  Q      Lake Orion.  Okay.

13         They show up at your apartment.  And, again, they

14  come in and they do another search warrant, right?

15  A      That was in Berkley, yes.

16  Q      That was in Berkley.

17         And, again, it scared you yet again?

18  A      Absolutely.

19  Q      Okay.  In fact, because of this, you started having

20  anxiety attacks, right?

21  A      I was getting anxiety since -- anxiety attacks

22  since January 2012.

23  Q      Since, since they first executed the search

24  warrant?

25  A      Yes.

                    Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII - 12/11/14
Lori Maday-Cross Exam/Mr. Machasic (cont.)

1   Q     In fact, even hearing a knock on a neighbor's door

2   would cause you to be jumpy, right?

3   A     Yes.

4   Q     After the FBI comes to Maurice, comes to your work,

5   comes to your new apartment, you actually had to seek

6   counseling to help you with that anxiety, right?

7   A     Yes.

8   Q     Do you need a drink of water?

9   A     No.  I'm all right.

10  Q     Now let's talk about "Property patches".

11  A     Okay.

12  Q     You didn't wear a "Property Of patch", did you?

13  A     No.

14  Q     And nobody forced a "Property patch" on you?

15  A     No.

16  Q     It was optional for you to wear that "Property Of

17  patch", right?

18  A     Yeah.

19  Q     Your choice was I'm not wearing a "Property Of

20  patch"?

21  A     Correct.

22  Q     Let me take you around 2011 around Thanksgiving.

23        About Thanksgiving 2011, do you recall is that when

24  Dave had his one year anniversary --

25  A     Yes.

Usa v Sutherland, et al 11-20129; 11-20066

                    Jury Trial Vol. XXVIII - 12/11/14
                Lori Maday-Cross Exam/Mr. Machasic (cont.)

1    Q    -- with the DDMC?

2    A    Yes.

3    Q    It's about 2011 Thanksgiving, he got a pie in the

4    face or a cake?

5    A    It was a pie.

6    Q    They put a pie in your face.  That's how they

7    celebrate your one year birthday, I guess, in the DDMC?

8    A    That was often a ritual is putting a cake in your

9    face.

10   Q    Okay.  The person who's getting a cake or pie in

11   the face, like, you know that's coming, right?

12   A    Yeah.

13   Q    Okay.  And it's kind of a joke, every about laughs

14   about it?

15   A    Uh-huh.  Correct.

16   Q    Now part of what the FBI seized was your camera,

17   correct?

18   A    Yes.

19   Q    Took your camera.

20        You had a lot of photographs on it, right?

21   A    Yes.

22        MR. MACHASIC:  And I'm going to -- if I may

23   approach the witness, Your Honor?

24        THE COURT:  Yes, sir.

25

               Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII - 12/11/14
Lori Maday-Cross Exam/Mr. Machasic (cont.)

1   BY MR. MACHASIC:

2   Q    I'm going to ask you if you recognize one of these

3   things that was on your camera.

4                         (After a short delay, the

5                         proceedings continued)

6   A    I can't be certain at this time.

7   Q    You can't be certain.  That's okay.

8            MR. MACHASIC:  May I have one moment, Your

9   Honor?

10           THE COURT:  You may.

11       (A discussion was held off the record)

12           MR. MACHASIC:  Your Honor, without objection,

13  I'm simply going to move for Defense Proposed Exhibit

14  13.

15           MR. STRAUS:  No objection, Your Honor.

16           THE COURT:  It's identified as?

17           MR. MACHASIC:  This is a photograph that

18  was --

19           THE COURT:  A photograph.  That's fine.

20  Photograph Defense 13, without objection, received.

21       Go ahead and deal with it then.

22           MR. MACHASIC:  I think I'd like to publish

23  Defense Exhibit 13.

24  BY MR. MACHASIC:

25  Q    Ms. Maday, can you identify what it is?

            Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII - 12/11/14
Lori Maday-Cross Exam/Mr. Machasic (cont.)

1    A    It looks like maybe a back of a shirt.

2    Q    And are Devil's Diciples listed on there?

3    A    Yes.

4    Q    As being supporters of the Thunder Roads Support

5    Our Troops?

6    A    Yes.

7    Q    That's 2011.

8    A    Uh-huh.

9    Q    Okay.  Nearly at the end, Ms. Maday.

10        The bolt that the government showed you, that

11   little bolt?

12   A    Yes.

13   Q    That had Meth residue on it, right?

14   A    Correct.

15   Q    And you said that Dave received that when he took a

16   trip out to California?

17   A    Yes.

18   Q    So you don't know how the Meth residue got in

19   there, just he didn't have a bolt when he went to

20   California, right?

21   A    Correct.

22   Q    Comes back to Michigan after going out and partying

23   in California?

24   A    Uh-huh.

25   Q    By the way, you were working at this time?

        Usa v Sutherland, et al 11-20129; 11-20066

                    Jury Trial Vol. XXVIII - 12/11/14
                    Lori Maday-Cross Exam/Mr. Machasic (cont.)

1    A     Yes.

2    Q     So you're going to work and he's out in California

3    partying?

4    A     Yes.

5    Q     Then he comes back and he's got a bolt.

6          And it's got the remanence of Meth inside of it,

7    right?

8    A     Correct.

9    Q     The photographs that the government showed you of D

10   holding two sidearms with "Cracker"?

11   A     Yes.

12   Q     Do you recall those photos?

13   A     Yes.

14   Q     Do you recall taking them?

15   A     Yes.

16   Q     And this was at Clem's Poorhouse, right?

17   A     Yes.

18   Q     And at the time was "Lurch" managing it?

19   A     Yes.

20   Q     "Lurch" kept -- if you know, "Lurch" kept sidearms

21   in the back office?

22   A     He kept what?

23   Q     Firearms, guns, in the back office?

24   A     I can't be certain.

25   Q     Okay.  Do you know if either of those sidearms

                    Usa v Sutherland, et al 11-20129; 11-20066

                        Jury Trial Vol. XXVIII - 12/11/14
                      Lori Maday-Cross Exam/Mr. Machasic (cont.)

1   belonged to "Lurch"?

2   A    I've no idea.

3   Q    Okay.  Now let's -- one last thing.

4        That is, you gave -- earlier, you gave a sworn

5   statement in this case, correct?

6   A    Yes.

7   Q    An affidavit.

8        You signed an affidavit?

9   A    Yes.

10  Q    And in that affidavit, you stated that you didn't

11  think that David Drozdowski posed a danger to the

12  community.  Correct?

13  A    Correct.

14  Q    And then after that, the government filed a

15  criminal complaint, right?

16  A    Yes.

17  Q    Okay.  And in that complaint, they charged you with

18  conspiracy to manufacture and distribute

19  methamphetamine?

20  A    Yes.

21  Q    And this was actually shortly after you signed that

22  affidavit, right?

23       Matter of a couple months, maybe?

24  A    Yes.

25  Q    Okay.  Now it was explained to you that that was a

                    Usa v Sutherland, et al 11-20129; 11-20066

               Jury Trial Vol. XXVIII - 12/11/14
           Lori Maday-Cross Exam/Mr. Machasic (cont.)

1   light felony?

2   A     Yes.

3   Q     And that perhaps based on amounts, it could be a

4   mandatory minimum of 10 years?

5   A     Yes.

6   Q     You went in and -- by the way, this is after the

7   FBI had already come in and raided you, right?

8   A     I can't remember what happened first.

9   Q     Okay.  It was after the Maurice search warrant

10  execution, right?

11  A     Oh, yes.

12  Q     Was it after they came to your work?

13  A     Yes.

14  Q     Okay.  So they had already come to you twice,

15  right?

16  A     I, I actually had seen them three times.

17  Q     At the point that they filed the complaint?

18  A     Yes.

19  Q     Okay.  Now after they, after they do this, after

20  they file this complaint, you then start talking to them

21  in terms of trying to resolve everything, right?

22  A     Yes.

23  Q     And you had the very good assistance of counsel in

24  helping you to do that, right?

25  A     Yes.

               Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII - 12/11/14
Lori Maday-Cross Exam/Mr. Machasic (cont.)

1  Q    And in terms of doing that, you are now simply

2  charged with a misdemeanor, right?

3       I believe that's what I heard on direct.

4  A    Yes.

5  Q    It's your hope and expectation that you will

6  receive probation as part of this, right?

7  A    Yes.

8  Q    You also signed a cooperation agreement with the

9  government?

10 A    Yes.

11 Q    Okay.  And your lawyer explained to you that that

12 cooperation agreement obligated you to come to court

13 when the government asks to you come to court, right?

14 A    Yes.

15 Q    And to testify on behalf of the government, right?

16 A    Yes.

17 Q    And, so, today, you come here because you're

18 required to be here, right?

19 A    Yes.

20 Q    This is not a pleasant experience for you.

21 A    None of this has been, no.

22 Q    And your lawyer explained to you that in terms of

23 the cooperation agreement, this is pretty standard

24 language, right?

25      This is how the cooperation agreements go?

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII   12/11/14
Lori Maday-Cross Examination/Mr. Straus

1    A    Yes.

2    Q    And that in terms of the extent of cooperation and

3    the testimony, it's up to the government to make the

4    determination as to what recommendations they will make,

5    and what, ultimately, they will do when it comes time

6    for sentencing or a plea agreement; anything like that.

7    Right?

8    A    Yes.

9    Q    Okay.

10            MR. MACHASIC:  May I have one moment, please,

11    Your Honor?

12            THE COURT:  Yes.

13       (A discussion was held off the record)

14            MR. MACHASIC:  Your Honor, thank you.  No

15    further questions.

16            THE COURT:  Any other cross examination?

17       Any redirect examination?

18            MR. STRAUS:  Yes, Your Honor.

19                   REDIRECT   EXAMINATION

20    BY MR. STRAUS:

21    Q    Ms. Maday, you were asked on cross examination --

22    move this around.

23       You were asked on cross examination about

24    counseling.

25       Has your life changed since these arrests, these

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII   12/11/14
Lori Maday-Cross Examination/Mr. Straus

1   contacts with law enforcement?

2   A    Yes.

3   Q    Have you turned your life around?

4   A    Yes.  Yes.

5   Q    That one of the reasons you're here as well?

6   A    Yes.

7   Q    Are you still in love with Dave?

8   A    No.

9   Q    Now you were -- on cross examination, you were, you

10  were asked a series of questions about an interview that

11  took place at your work.

12       You weren't actually interviewed in front of a

13  whole bunch of people, were you?

14  A    No.

15  Q    You were taken to, to -- by security to a separate

16  area, correct?

17  A    Correct.

18  Q    And nobody came bouncing in and announcing their

19  appearance.

20       They went -- the FBI went through security and

21  quietly interviewed you, correct?

22  A    Correct.

23  Q    And they interviewed you not -- this was after Dave

24  had been arrested on this case, the RICO case, correct?

25  A    Correct.

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII   12/11/14
Lori Maday-Cross Examination/Mr. Straus

1   Q    This was, this was an interview about a new matter

2   involving Dave, correct?

3   A    Correct.

4   Q    And there you talked about two search warrants,

5   correct?

6              MR. MACHASIC:  Objection, Your Honor.  This is

7   403.

8              THE COURT:  I think that the substance will

9   probably be -- whatever it is, will probably be

10  restrained.

11             MR. STRAUS:  It will be very restrained, Your

12  Honor.

13             THE COURT:  I'm going to take that.

14     I don't know what it is that you're speaking of

15  exactly, but Mr. Straus will be restrained as he said.

16     Go ahead.  We're talking about the interaction with

17  her, I think.

18             MR. STRAUS:  Yes.

19  BY MR. STRAUS:

20  Q    When the FBI came to your apartment, again and

21  searched your house, that was on a new investigative

22  matter involving David and possibly yourself, correct,

23  the second time?

24  A    Right.  I -- I guess so, yes.

25  Q    Okay.  And, and just so the jury knows, a bunch of

Jury Trial Vol. XXVIII    12/11/14
Lori Maday-Cross Examination/Mr. Straus

1    letters were taken during that second search, correct?

2    A    Correct.

3    Q    And those were letters from David to you, correct?

4    A    Yes.

5    Q    All right.  And he had already been charged here in

6    this case, correct?

7    A    Charged?

8    Q    In the RICO conspiracy already?

9    A    Yes.

10   Q    And he wasn't -- he wasn't, obviously, living there

11   anymore, was he, with you?

12   A    No.

13   Q    Now you were also asked some questions about after

14   Meth was produced in the coffee filter, you, Dave, other

15   people consumed the Meth.  Correct?

16   A    Correct.

17   Q    But there were other times that the Meth was bagged

18   up in those little bags.

19        And then later, you and Dave would go to the club

20   house, correct?

21   A    It didn't happen all the time.

22   Q    Sometimes.

23   A    Uh-huh.

24   Q    You were also -- by the way, your motorcycle;

25   that's named Rose?

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII    12/11/14
Lori Maday-Cross Examination/Mr. Straus

1    A    Yes.

2    Q    Does Rose have Devil's Diciples emblems and

3    stickers on it?

4    A    I couldn't remember at this time.  It did at once.

5    Q    Okay.  But you don't have it in your custody

6    anymore?

7    A    No.

8    Q    That wasn't your real -- that really wasn't your

9    motorcycle.

10   A    No.

11   Q    Was this somewhat part of the mooching?

12   A    Yes.

13   Q    And you're also asked some questions about the

14   Devil's Diciples being dysfunctional.

15       Is it -- was your understanding women were treated

16   differently then men within the Devil's Diciples?

17   A    Yes.

18   Q    And was there an equal --

19           MS. STOUT:  I'm going to object to relevance

20   of how men treated women.  Thank you, Your Honor.

21           THE COURT:  It's related to cross examination.

22   And the objection's overruled.

23           MR. MACHASIC:  Actually, Your Honor, I'm

24   sorry, but I join Ms. Stout's objection, Judge.

25           I would indicate that I never went into women's

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII   12/11/14
Lori Maday-Cross Examination/Mr. Straus

1    roles in the Devil's Diciples during my cross

2    examination.

3           THE COURT:  The concept was dysfunctional

4    relationships.  That's reasonable as far as I'm

5    concerned.

6       Go ahead.

7           MR. STRAUS:  I'm sorry, Your Honor.  It was

8    foundational.

9           THE COURT:  Go ahead.

10   BY MR. STRAUS:

11   Q    Was there an equal distribution of information

12   between women and men within the Devil's Diciples

13   environment?

14       In other words, were women privy to everything men

15   were?

16   A    No.

17   Q    In fact, Devil's Diciples kept a lot of information

18   from their women?

19   A    Absolutely.

20   Q    So when you talk about dysfunctional --

21          MS. STOUT:  I'm going to object to Devil's

22   Diciples.  She certainly doesn't know every Devil's

23   Diciples.  It's quite a broad statement.

24          THE COURT:  Overruled.

25

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII    12/11/14
Lori Maday-Cross Examination/Mr. Straus

1  BY MR. STRAUS:

2  Q    So when you were asked questions and you agreed

3  with the conclusion that there was some dysfunctionality

4  within the Devil's Diciples, was that based solely on

5  your own observations or was that from input from David?

6  A    It was mainly my own.

7       But based on some input that I -- conversations,

8  yes.

9  Q    Okay.  Dave's view of the world, correct?

10 A    Yes.

11 Q    Finally, you were asked -- you signed an affidavit

12 during the -- after Dave was arrested, you signed an

13 affidavit in support of some kind of motion before this

14 court?

15      Do you remember that testimony?

16 A    Yes.

17 Q    And you signed an affidavit that said you did not,

18 at that time, believe he was a danger to the community

19 or risk of flight?

20 A    Correct.

21 Q    Has that opinion changed?

22 A    Somewhat, yes.

23 Q    All right.

24      MR. STRAUS:  No further questions.

25      THE COURT:  All right.  You may step down and

Jury Trial Vol. XXVIII 12/11/14
Chris Adams-Direct Examination/Mr. Straus

1   be excused.

2                    (The witness was excused

3                    at 9:50 a.m.)

4        THE COURT:  Next witness will be whom?

5        MR. STRAUS:  Your Honor, at this time, the

6   United States would call Chris Adams.

7        THE COURT:  Relevant to what counts?  Relative

8   to any particular counts?

9        MR. STRAUS:  Count Two, Your Honor, the

10  gambling conspiracy.

11       (Whereupon the witness was then sworn)

12                    **DIRECT EXAMINATION**

13  BY MR. STRAUS:

14  Q    Sir, could you state your name and spell your last

15  name for the record, please.

16  A    James Christian Adams a-d-a-m-s.

17  Q    Sir, before we begin -- and the record should so

18  reflect, I think I have some original notes of yours.

19       Did you bring your file?

20  A    I did.

21  Q    All right.  Sir, where are you employed?

22  A    Michigan Gambling Control Board for the State of

23  Michigan.

24  Q    And in what capacity?

25  A    Gaming Lab Manager.

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII 12/11/14
Chris Adams-Direct Examination/Mr. Straus

1    Q    What does a Gambling Lab Manager do?

2    A    I supervise a section that evaluates and certifies

3    all electronic gaming devices, that would include slot

4    machines and video pokers and, also, the slot accounting

5    systems they keep track of game performance.

6    Q    Okay.  And how long have you been doing that?

7    A    In February, it will be 10 years.

8    Q    2005?

9    A    Yeah.

10   Q    And before you were employed with the Michigan

11   Gambling Control Board -- is that MGCB for short?

12   A    Yes.

13   Q    Were you employed in any other capacity within the

14   gambling slot machine world?

15   A    Yes.  I worked for a manufacturer of video poker

16   and slot machines for seven years.

17   Q    Okay.  And what was -- what types of jobs did you

18   do with that outfit?

19   A    Started as a manufacturing engineer and operations

20   manager.  So I was in charge of production,

21   installation, customer service, inventory.

22   Q    Okay.  And what is your educational background?

23   A    Mechanical engineer.

24   Q    Okay.  In terms of your former job and your current

25   job, does it involve aspects of that electrical

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII 12/11/14
Chris Adams-Direct Examination/Mr. Straus

1  engineering type of background, mechanical engineering

2  or both?

3  A    A little bit of both, but the slot machines

4  nowadays are primarily electronic.

5  Q    Okay.  And have you, have you, have you had any

6  training, specialized training in slot machines and

7  their use and their functionality?

8  A    Yes.

9       I've attended training on illegal gaming devices

10  and then we also get trained by the manufacturers of the

11  slot machines and video poker games.

12  Q    Did you receive any training when you were in the

13  private sector?

14  A    Just on the job.

15  Q    On the job.

16       So would it be fair to say you're fairly familiar

17  with the insides of slot machines?

18  A    Yes, that would be fair.

19  Q    Did there come a point in time where you were asked

20  to review some slot machines that had been seized by the

21  Federal Bureau of Investigation?

22  A    Yes.

23  Q    And when, approximately, was that?

24  A    It was about seven years ago.

25  Q    Seven years ago?

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII 12/11/14
Chris Adams-Direct Examination/Mr. Straus

1   A    Yeah.

2   Q    And was that at or around the time they had, to

3   your knowledge, been seized in search warrants?

4   A    Yes.

5   Q    All right.

6        Let me direct your attention to -- let me go

7   through some -- I'm going to name some slot machines and

8   their serials.

9        If it will assist you, please refer to your notes.

10  But did you -- during that request, did you examine a

11  Roaring 20's Slot Machine, serial number S970519159,

12  that was manufactured by Balley?

13  A    Yes.

14            MR. STRAUS:  And for the benefit of the

15  record, Your Honor, that would be the machine, just to

16  benefit the jury, also, depicted in the photograph that

17  is represented by Government Exhibit 3-1.

18  BY MR. STRAUS:

19  Q    Secondly, did you examine an All American Slot

20  Machine, serial number S63U3WT10, manufactured by

21  Balley?

22       And for purposes of the record, this would be

23  represent -- the machine represented in the photograph

24  that has been marked as Government Exhibit 3-2.

25

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII 12/11/14
Chris Adams-Direct Examination/Mr. Straus

1    A    Yes.

2    Q    Did you also review, examine a casino poker

3    machine, serial number 800910, manufactured by Cal

4    Omega?

5         And for benefit of the record, this is the machine

6    that's represented in the photograph that has been

7    previously admitted as Government Exhibit 3-3?

8    A    Yes.

9    Q    Did you examine a red, white and blue slot machine,

10   serial number S970316561, that was manufactured by

11   Balley.

12        And for the benefit of the record, which is a

13   machine that's depicted in the photograph that's

14   represented by Government Exhibit 3-4?

15   A    Yes.

16   Q    Did you also examine a Draw Poker Machine, serial

17   number 2977, manufactured by United Gaming that is

18   represented in a photograph that is marked Government's

19   Exhibit 3-5?

20   A    Yes.

21   Q    Did you examine a Double Fortune Slot Machine,

22   serial number 95796, that was manufactured by

23   University, that is represented by a photograph that has

24   been marked as Government Exhibit 3-6?

25   A    Yes.

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII 12/11/14
Chris Adams-Direct Examination/Mr. Straus

1   Q    Did you also examine a Malilbu Double Slot Machine

2   manufactured by Sigma, which is represented by a

3   photograph that has been marked Government Exhibit 3-7?

4   A    Yes.

5   Q    Did you also examine a High Roller Slot Machine,

6   manufactured by Sigma, which is represented by

7   photographs that are represented in Government Exhibits

8   3-8, 3-9 and 3-10?

9   A    Yes.

10  Q    The name's are getting better.

11       Did you examine a Blazing 7's Slot Machine, serial

12  number S970316552, that was manufactured by Balley,

13  represented by a photograph that has been previously

14  marked as Government Exhibit 3-11?

15  A    Yes.

16  Q    Did you also examine a Second Chance Seven Slot

17  Machine, serial number S950100082, that was manufactured

18  by Balley, represented by a photograph which has been

19  previously marked and admitted as Exhibit 3-12?

20  A    Yes.

21  Q    Did you also examine a Blazing 7's Slot Machine

22  that was manufactured by Balley, is represented by a

23  photograph which has been marked as Government Exhibit

24  3-13?

25  A    Yes.

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII 12/11/14
Chris Adams-Direct Examination/Mr. Straus

1  Q    How about a Stars and Bars Slot Machine, serial

2  number S63L3MT-10 which is represented by a photograph

3  that has been previously marked and admitted as

4  Government Exhibit 3-14?

5  A    Yes.

6  Q    Did you examine a Wild Rose Slot Machine, serial

7  number S930805443, that was manufactured by Balley, that

8  is represented by a photograph marked Government Exhibit

9  3-15?

10  A    Yes.

11  Q    Did you also examine another Wild Rose Slot

12  Machine, serial number S960403714, manufactured by

13  Balley, that is represented by a photograph --

14  photograph that's been marked Proposed Government 3-16

15  that has not been admitted at this point?

16  A    Yes.

17  Q    Have you also reviewed a Panic Saurus Slot Machine

18  that was manufactured by Yamasa Company.

19       And for benefit of the Court Reporter, I'll spell

20  Yamasa.  Spelled y-a-m-a-s-a.

21       That is represented by a photograph that's been

22  marked 3-20.  It's a Proposed Government Exhibit?

23  A    Yes.

24  Q    Did you --

25  A    Yes, I examined that.

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII 12/11/14
Chris Adams-Direct Examination/Mr. Straus

1   Q     Okay.  By my arithmetic, that's about 15 machines.

2         And did you go through all those machines?

3   A     Yeah, we looked through all those machines.

4   Q     You and someone else?

5   A     Yeah.  Aaron Pongrass, he's an employee for the

6   Gaming Control Board Lab.

7   Q     What kind of examination did you do with these

8   machines?

9   A     We recorded the manufactured date, the serial

10  number.

11        Where available, we wrote down the software version

12  numbers from the board that runs the slot machines.

13  Q     Okay.  And did you also make any observations as to

14  whether or not these machines would accept U.S.

15  currency?

16  A     We did and they did.

17  Q     And did you find any indication of that?

18  A     Yeah.

19        The games were set up to accept U.S. quarters by

20  way of a coin comparator.  So there was a quarter in the

21  slot.

22  Q     What's a "coin comparator"?  Is that something that

23  holds a quarter?

24  A     Well, it does hold a quarter, but it holds a

25  quarter to compare to it what is inserted in the slot

Jury Trial Vol. XXVIII 12/11/14
Chris Adams-Direct Examination/Mr. Straus

1   machine.

2        So if you insert a nickel, it doesn't accept it as

3   a quarter, it goes to the tray.

4        But if you insert a U.S. quarter, it will go into

5   the hopper and accept it as a credit on the game.

6   Q    You said a tray.

7        Were these games -- based on your examination, were

8   you able to determine whether or not they paid out?

9   A    There was -- another thing that we checked was,

10  where available, the game records accounting meters.

11  And for a variety of things.

12       And there was meter activity on those games, so

13  they had been used.

14  Q    Okay.  And you mentioned "dates."

15       How do you determine when a machine is made?

16  A    We use the serial number tag that was riveted to

17  the side of the games from the manufacture.

18  Q    Did you compare it to some kind of database of

19  sorts?

20  A    Not the manufacture date.

21       We're able to look up the software version number

22  that was installed on the boards inside the slot

23  machines.

24  Q    And did you do that with each and everyone of these

25  machines or --

Jury Trial Vol. XXVIII 12/11/14
Chris Adams-Direct Examination/Mr. Straus

1    A    Yeah, I did.

2    Q    And were those machines -- based on that, were you

3    able to determine whether or not these machines, as of

4    the date of your examination, not today, were less then

5    25 years old?

6    A    Yeah.

7         When we first looked at these, none of them were

8    older then 25 years old.

9    Q    All right.

10        And these -- these lot machines -- just for benefit

11   of the jury, these have the drums and wheels that spin?

12   A    Except for the ones that were the video poker, yes.

13   Q    And as -- were you familiar with these games?

14        Had you seen these types of games before?

15   A    Yeah.  They were the same type of games used in the

16   casinos here in Detroit.

17   Q    Of all those machines, were there any that had any

18   evidence that they had actually been used in casinos?

19   A    Yes.  There were some seals that were on the boards

20   that sealed the e-prompt chips into the board.

21        There was at least one.  I'd have to refer to my

22   notes, it might have been two, that had New Jersey

23   gaming seals on it.  So they had actually been in New

24   Jersey casinos.

25        And there was at least one that had a Soaring Eagle

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII  12/11/14
Chris Adams-Cross Examination/Ms. Maceroni

1  tag seal on it to seal those chips into the board.

2  Q    Did you recognize any of your outfit's sealing

3  designations?

4  A    No.  There were no MGCB seals on there.

5  Q    Okay.  Based on that review, do you have an opinion

6  as to whether or not, as designed, these, these had --

7  these were designed to be game of chance?

8  A    Yes.

9  Q    All right.

10         MR. STRAUS:  I've no further questions, Your

11  Honor.

12         THE COURT:  Cross examination?

13         MS. MACERONI:  Thank you, Judge.

14               CROSS EXAMINATION

15  BY MS. MACERONI:

16  Q    Good morning, Mr. Adam. (sic)

17  A    Good morning.

18  Q    You testified that your examination of the

19  machines -- you actually took the machines a part?

20  A    We did not disassemble them.

21       We did take the P.C. board out that runs the

22  E-prompt that runs the software.

23  Q    Okay.  Now for us computer illiterates, can you go

24  through that step by step?

25  A    Okay.  Sure.

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII  12/11/14
Chris Adams-Cross Examination/Ms. Maceroni

1    There's a printed circuit board that is in the game

2  and it has software on it that runs, that runs the slot

3  machine.

4  Q    The software that can be updated or changed through

5  the course of the machine?

6  A    No.  The software that is on those boards cannot be

7  updated externally through the game.

8    They're burned onto -- the software's burned onto a

9  chip.

10    That's actually why the gaming agents will put the

11  tape in.

12    Once it's sealed in, there will be evidence if it's

13  been taken out and updated.

14  Q    And so that was how you were able to determine the

15  age of some of these machines?

16  A    The age was from the manufacture date on the serial

17  number tag.

18  Q    Okay.  And you prepared a report after your

19  examination of these machines; is that correct?

20  A    Correct.

21  Q    All right.

22    Do you have a copy of that report up there?

23  A    I don't have the actual report with me right now.

24  Q    If I ask you a question and you don't recall, just

25  let me know and we can get you one.  Okay?

Jury Trial Vol. XXVIII  12/11/14
Chris Adams-Cross Examination/Ms. Maceroni

1    A    Okay.

2    Q    You also -- my understanding is, you had some

3    handwritten notes that we were given?

4    A    Yeah.  Those I have.

5    Q    All right.  Good.

6         Now in going through your report, in the paragraph

7    that's been labeled G, there's no indication of what

8    year that machine was made.  Do you recall that?

9         That was the Malibu Double Slot Machine

10   manufactured by Sigma?

11   A    Correct.

12   Q    So you don't have any manufacture date for that

13   Malibu Double Slot Machine?

14   A    That's correct.

15   Q    All of these machines, sir, were 25-cent machines.

16   Yes?

17   A    Yes.

18   Q    So they basically played quarters?

19   A    Correct.

20   Q    So for the Malibu Double Slot Machine, you don't

21   have a manufacturer date.

22        Also, the High Roller Slot Machine manufactured by

23   Sigma, you don't have a manufacturer date down there as

24   well, do you?

25   A    No.  It was not on a serial number tag, no.

          Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII   12/11/14
Chris Adams-Cross Examination/Ms. Maceroni

1   Q    And, actually, those -- there were three machines

2   there identified as pictures from the Government 3-8,

3   3-9 and 3-10.  Yes?

4   A    I don't have those pictures or numbers, but that

5   sounds right.

6   Q    Sounds right?

7        Do you want to see a copy of your report?

8   A    No.  That's okay.

9   Q    You would agree with that?

10  A    Yes.

11  Q    There's no manufacture date on those?

12  A    Right.

13  Q    And then on paragraph zero, the Panic Saurus Slot

14  Machine which was manufactured by Yamasa Company.

15       Do you recall that machine?

16  A    I do.

17  Q    And, actually, the wording on that machine was

18  agent and you couldn't interpret what it said, correct?

19  A    Correct.

20  Q    So there no manufactured date on that machine?

21  A    I don't recall on that one.

22  Q    Would you like to see a copy of your report?

23  A    Sure.

24          MR. STRAUS:  Can I see that serial number tag?

25          MS. MACERONI:  Sure.

Usa v Sutherland, et al 11-20129; 11-20066

                    Jury Trial Vol. XXVIII  12/11/14
                 Chris Adams-Cross Examination/Ms. Maceroni

1                        (After a short delay, the

2                        proceedings continued)

3           MS. MACERONI:  You can read whatever you want

4   in this compiled report, but what I'm referring is to

5   down there.

6                        (After a short delay, the

7                        proceedings continued)

8           THE WITNESS:  Right.

9       We didn't record a manufacturer date on that, so it

10  wasn't, it wasn't on the machine.

11  BY MS. MACERONI:

12  Q    So you couldn't establish the dates of three

13  machines that did not have a manufactured date, correct?

14  A    Correct.

15  Q    Now, sir, you, you don't have any law enforcement

16  background; is that a fair statement?

17  A    That's fair.

18  Q    You've got a mechanical engineering background and

19  you've, you've worked in the industry examining machines

20  for law enforcement personnel.  Correct?

21  A    We've examined games prior to their use in the

22  Detroit casino market, but in our current -- in my

23  current role.

24  Q    So it's for law enforcement as well as for the

25  casinos?

                 Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial Vol. XXVIII  12/11/14
Chris Adams-Cross Examination/Ms. Maceroni

1   A    It for our gaming regulators, which is like a law

2   enforcement agency, but not.

3   Q    Okay.  And in the course of that occupation, you

4   know that any machine that pays out currency in Michigan

5   has to be older then 25 years in order be legal if it's

6   not in a casino?

7   A    The Michigan Complied Law, as I understand it, is

8   that you cannot possess a slot machine less then 25

9   years old.

10  Q    So are you agreeing with what I said?

11  A    Well, I think your statement had something to do

12  with paying out currency.

13  Q    Yes.

14  A    I don't believe that's what the Michigan Compiled

15  Laws states.

16  Q    So whether or not the slot machine pays out money

17  or pays out tokens, in order for a private individual to

18  have it, it has to be more than 25 years old?

19  A    Correct.  That's my understanding.

20  Q    That's your understanding, okay.

21       But in any event, 25 years is the point of

22  consideration in determining the legalities of private

23  ownership?

24  A    Correct.

25  Q    Are you aware, sir, that different states have

Usa v Sutherland, et al 11-20129; 11-20066

```
                    Jury Trial Vol. XXVIII  12/11/14
                 Chris Adams-Cross Examination/Ms. Maceroni
```

 1   different laws concerning that 25 year mark?

 2   A    I am.

 3   Q    In fact, in Ohio, there is no such 25 year

 4   designation, correct?

 5   A    I'm not aware of that, but I'm not surprised by

 6   that.

 7   Q    Okay.  Because different -- there's no one uniform

 8   standard in the industry, correct?

 9   A    That would all vary based on individual state law,

10   correct.

11   Q    And you're aware of a companies or shops, such as

12   like Games People Play, that sell these machines to the

13   general public?

14   A    Yes.

15   Q    And are you aware of any type of state regulation

16   of those types of stores that sell those machines to the

17   public?

18   A    I'm not aware.

19   Q    Okay.

20   A    Just to clarify, the Michigan Gaming Controlled

21   Board doesn't regulate what is sold from private stores

22   to private owners.

23   Q    Okay.  So there's no state regulation that you know

24   of?

25   A    Regarding the sale, not that I'm aware of.

```
                 Usa v Sutherland, et al 11-20129; 11-20066
```

Jury Trial Vol. XXVIII  12/11/14
Chris Adams-Cross Examination/Ms. Maceroni

1   Q      Okay.

2          So these individuals who own these stores, like

3   Games People Play, they're not required to obtain some

4   sort of license from the state in order to sell these,

5   these machines.  Correct?

6   A      Correct, not from the state.

7          There is a federal requirement called the Johnson

8   Act that people who possess or who will be distributing

9   slot machines need to be registered with the Department

10  of Justice.

11  Q      Are you aware of these stores having any type of

12  spot inspections by any federal agents or state agents

13  to see what they're selling?

14  A      I'm not aware.

15  Q      And, in fact, isn't it true, sir, that an owner of

16  one of these shops could go to a casino that was selling

17  some machines and purchase those machines?

18  A      I'm sorry.  Could you repeat that?

19  Q      Sure.

20         If you, you own a store that sells these types of

21  machines for entertainment, like Games People Play, they

22  could go to a casino who is selling older machines and

23  purchase them, yes?

24  A      Yes, kind of.

25         The casinos can only deal with licensed

                    Jury Trial Vol. XXVIII  12/11/14
                Chris Adams-Cross Examination/Ms. Maceroni

1    distributors.

2    Q    Okay.  So like you're talking about the Johnson Act

3    before?

4    A    Correct.

5    Q    All right.

6         So they could -- but a person who owns a store,

7    like Games People Play, can be registered under that

8    federal law, correct?

9    A    I believe so, yes.

10   Q    Okay.  And just so I understand this 25 year mark,

11   you were looking at these machines in 2007, yes?

12   A    Yes.

13   Q    Okay.  So if my math is correct, if these machines

14   had been made or had been manufactured in 1980, they

15   would have been legal to have been in use by a private

16   individual.  Yes?

17   A    Correct.

18   Q    1981, there wouldn't have been a problem, correct?

19   A    Correct.

20   Q    1982, though, that's the cut off mark.  Yes?

21   A    For 2007, yes.

22   Q    Okay.  And if you're a private citizen walking into

23   a store, such as Games People Play, would you agree with

24   me that it's incumbent on the owner of that store to let

25   the customers know whether or not what they're buying is

                Usa v Sutherland, et al 11-20129; 11-20066

1   legal?

2           MR. STRAUS:  I'll object.  I don't know if

3   there's any foundation for that whatsoever.

4           THE COURT:  I agree.  Asking for a legal

5   opinion basically.  Next question.

6   BY MS. MACERONI:

7   Q    Have you ever seen anyone or ever gone to Games

8   People Play in the course of your employment?

9   A    A store that sells used slot machines?

10  Q    Yes.

11  A    No.

12  Q    Okay.  And, again, sir, this 25 year mark is not

13  something that's standard across the country.  Correct?

14  It's just in Michigan, as far as you know?

15  A    Correct.

16          MS. MACERONI:  Thank you.  I don't have

17  anything else.

18          THE COURT:  Any other cross?  Any redirect,

19  Mr. Straus?

20          MR. STRAUS:  Yes, Your Honor.  Just briefly.

21                  REDIRECT EXAMINATION

22  BY MR. STRAUS:

23  Q    Mr. Adams, you're not a lawyer, are you?

24  A    No.

25  Q    You're not a police officer?

Jury Trial   Vol. XXVIII   12/11/2014
Chris Adams-Redirect Exam/Mr. Straus

1    A    No.

2    Q    You're not involved in the enforcement end of the

3    gaming world, are you?

4    A    No.

5    Q    You were asked a series of questions about this 25

6    year mark.

7         You opined on direct these machines were built

8    within the previous 25 years of your examination, which

9    I think was November of 2007.

10        Yes?

11   A    Yes.

12   Q    And during the course of your working for -- in the

13   private sector and working for the Gaming Board, have

14   you seen -- have you seen a wide variety of these

15   machines?

16   A    Yes.

17   Q    Have you seen the progression of the styles of

18   these machines over time?

19   A    Yeah.

20   Q    And some of these were made by Balley, I take it?

21   A    Correct.

22   Q    And some were made by some more obscure brands?

23   A    Yes.

24   Q    And, in your opinion, based on seeing these things,

25   were these -- were the ones that didn't have numbers,

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial  Vol. XXVIII  12/11/2014
Chris Adams-Redirect Exam/Mr. Straus

1    were these the types of machines that were floating

2    around in 1982-1981?

3              MS. MACERONI:  Judge, I'd object.  Lack of

4    foundation.

5              THE COURT:  Overruled.

6              THE WITNESS:  I wasn't in the industry in

7    1982, but -- so I couldn't really say what was, what was

8    there.

9         But the circuit board based --

10             MS. MACERONI:  Your Honor, based on his

11   answer, I'd make my objection again.  He said I wasn't

12   really around in 1982.

13             THE COURT:  You don't have to been around in

14   1928 to know what's current in 1982, based upon further

15   experience.  Overruled.  Go ahead.

16   BY MR. STRAUS:

17   Q    You were saying something about the circuitry, I

18   take it?

19   A    Electronically run slot machines and video poker

20   games are, are pretty recent.

21        Early '80's to mid 80's is when, you know, they

22   started growing in use.

23   Q    Okay.  And based on your review of the circuitry,

24   the -- I guess it would be the solid state circuitry of

25   the ones that didn't have hard manufacturing dates on

Jury Trial  Vol. XXVIII  12/11/2014
Chris Adams-Redirect Exam/Mr. Straus

1   them, do you have an opinion as to the, the state of

2   technology of the circuitry on those; more recent or

3   older?

4   A    It would be tough to say with certainty, but it's

5   in the same type of generation of the rest of the games

6   that were there.

7   Q    Okay.  Now as you said, you weren't a you weren't a

8   lawyer.

9        When we talk about the -- I think you -- on cross

10  examination, you gave your understanding or impression,

11  even though you're not a lawyer of the law.

12       And I think you said something that to possess one

13  of these things that is less then 25 years old, just to

14  possess, that is illegal, correct?

15  A    That is my understanding of MCL, yeah.

16  Q    You are not saying that if someone were wished to

17  open a casino and load it up with machines that are

18  older then 25?

19            MR. MACHASIC:  Your Honor, I object.  This is

20  beyond this witness's knowledge.

21       He's testified he's not a lawyer.

22       The government was objecting to the same line of

23  questioning.  I object.

24            MR. STRAUS:  Oh, I think the cross examination

25  was pretty robust in this particular area, based on his

Jury Trial  Vol. XXVIII  12/11/2014
Chris Adams-Redirect Exam/Mr. Straus

1  limited knowledge.

2          THE COURT:  Your objection's overruled.

3          MR. PITTS:  I would join in. I would say the

4  question's leading.

5          THE COURT:  I've heard enough objections on

6  this.  I've heard enough objections.

7      The objection's overruled.  The question's within

8  the scope of cross examination.

9          MR. PITTS:  Your Honor, my objection is

10  leading, which is separate from their objections.

11          THE COURT:  Overruled.

12  BY MR. STRAUS:

13  Q   Mr. Adams, it's not your understanding that

14  somebody could open up a casino and load it up with old

15  machines, older then 25, 30 year old that paid out in

16  cash, that that would be a legal operation?

17          MR. PITTS:  Objection.  Improper hypothetical.

18          THE COURT:  Overruled.

19  BY MR. STRAUS:

20  Q   Mr. Adams?

21  A   Such establishment would not be legal.

22          MR. STRAUS:  All right.  Thank you.  No

23  further questions, Your Honor.

24      (A discussion was held off the record)

25

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial  Vol. XXVIII   12/11/2014
Lillian George-Direct Examination/Ms. Mohsin

1          MR. STRAUS:  All right.  Thank you.

2          THE COURT:  All right.  The witness may step

3  down.

4     (Whereupon the witness was excused at 10:19 a.m.)

5          MS. MOHSIN:  Your Honor, the government would

6  call Lillian George.

7     (Whereupon the witness was then sworn)

8                  **DIRECT EXAMINATION**

9  Q    Good morning.

10 A    Good morning.

11 Q    I'm going ask to you try to keep that microphone at

12 an appropriate distance so you may be heard clearly.

13     Could you please could you please state your full

14 name, spell your last name for the jury.

15 A    My name is Lillian George.  G-e-o-r-g-e.

16 Q    Mrs. George, are you Mrs.?

17 A    I am.

18 Q    And what do you do for a living?

19 A    I'm retired.

20 Q    And how long have you been retired?

21 A    A little over a year.

22 Q    And where are you retired from?

23 A    From the Pima County Sheriff's Department.  And

24 that's p-i-m-a.

25 Q    And when you say the Pima County Sheriff's

Jury Trial  Vol. XXVIII   12/11/2014
Lillian George-Direct Examination/Ms. Mohsin

1   Department, what state is that in?

2   A    In Arizona.

3   Q    How long were you employed by the Pima County

4   Sheriff's Department?

5   A    20 years.

6   Q    And, so, approximately, when did you begin as a

7   Pima County Law Enforcement Officer?

8   A    In 1994.

9   Q    And so I want to direct your attention to your

10  career with the Pima County Sheriff's Department or

11  Sheriff's Department.

12       In what capacity were you initially employed by the

13  Pima County Sheriff's Department as a law enforcement

14  officer?

15  A    I was a control deputy.

16       After I got out of the academy.  And so it was a

17  fully marked patrol vehicle with the lights and sirens,

18  the uniform, the vest.

19  Q    Can you move that microphone just a little bit

20  over.  That's perfect.

21       Now after that period of time, did there come a

22  time where you became a detective of any kind?

23  A    Yes.

24  Q    When did that occur?

25  A    I want to say it was right inside about 2001.

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial  Vol. XXVIII   12/11/2014
Lillian George-Direct Examination/Ms. Mohsin

1    Yeah.  That sounds about right.

2    Q    When you were a detective, what type of cases were

3    you assigned to handle?

4    A    Initially, I started in the Community Problems

5    Unit, which was anything from garden hoses to, you know,

6    big fraudulent kind of cases.

7        Then I went into robbery-aggravated assault, where

8    we did bank robberies, aggravated assaults, that kind of

9    thing, aggravated kinds of crimes.

10   Q    And did there come a time where -- when you were in

11   the Robbery Assault Unit, that you had occasion to

12   investigate offenses involving acts of violence?

13   A    Yes.

14   Q    And when you -- did that occur, you know, on any

15   sort with any sort of frequency?

16   A    Yes.

17   Q    Approximately, to the extent you can approximate,

18   how many types or how many types of cases or number of

19   cases, more appropriately, would you say you were

20   involved with that involved some sort of a violent

21   crime?

22       Would it be dozens?  Would it be -- give us a

23   range, if you can.

24   A    Pushing up into the hundred.

25   Q    Were any of the cases you were involved

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial  Vol. XXVIII   12/11/2014
Lillian George-Direct Examination/Ms. Mohsin

 1  investigating, did any of them involve beatings with any

 2  sort of dangerous weapons?

 3  A     Yes.

 4  Q     Did you ever investigate any cases involving

 5  individuals that had been struck with baseball bats?

 6  A     Yes.

 7  Q     And did you do that once or on more than one

 8  occasion?

 9  A     More than one occasion.

10  Q     Have you ever seen anyone that's had injuries that

11  were consistent with what appeared to be from baseball

12  bats?

13  A     Yes.

14  Q     All right.  Again, had that happened on one

15  occasion or more than one occasion?

16  A     More than one occasion.

17  Q     Now Pima County Arizona, does that encompass

18  Tucson, Arizona?

19  A     It does.

20  Q     Does it encompass Phoenix, Arizona?

21  A     No.

22  Q     What county is Phoenix, Arizona in?

23  A     They are in Maricopa County.

24  Q     Is that a county that abuts Pima County or is it

25  further away?

Jury Trial  Vol. XXVIII   12/11/2014
Lillian George-Direct Examination/Ms. Mohsin

1   A    There might be a little section to the very far

2   west by the California border where it does butt up

3   against it.

4        But Pinal County is between the Tucson-Pima County

5   area and the Phoenix Metro area.

6   Q    Now Arizona is -- just for the sake of making it

7   very clear.

8        Is Tucson in -- what part of Arizona is Tucson in?

9   A    It's in the very southwest portion of the state.

10  The closest to the border would be Nogales, Arizona.

11  Q    And where is Phoenix in relation to Tucson?

12  A    It's approximately less then 100 miles from Tucson

13  itself.

14  Q    Is it north, south, east, west?

15  A    It's north.

16  Q    I want to direct your attention to your experience.

17       Would it be fair to say you had been a law

18  enforcement officer for, about, 20 years or so?

19  A    Yes.

20  Q    And during that time, did you ever encounter or

21  have occasion to encounter members of motorcycle clubs

22  in your county?

23  A    Yes.

24  Q    Can you describe for the jury some of the

25  motorcycle clubs that you have encountered during your

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial  Vol. XXVIII   12/11/2014
Lillian George-Direct Examination/Ms. Mohsin

1   career as a Pima County law enforcement official?

2   A     Do you mean as far as the clubs themselves?

3   Q     Yes.

4         What clubs have you encountered, become aware of,

5   *et cetera*.

6   A     Well, there's, there's a couple of chapters for the

7   Hell's Angels that are in the Tucson area itself in the

8   city limits.

9         And then there's the Devil's Diciples.

10        And there's the -- I want to say -- there's a

11  couple of presence from other clubs that are kind of in

12  the area, but the Mongols are in the area as well.

13  Q     When you say "a couple of clubs in the area," are

14  you making any sort of a distinction between national

15  clubs or international clubs and local clubs?

16  A     Yes.

17  Q     All right.

18        Now, to your knowledge, you indicated there were a

19  couple of chapters of the Hell's Angels in Tucson.  Was

20  that what you said?

21  A     Yes.

22  Q     Are you familiar with whether or not the Hell's

23  Angels had motorcycle club chapters in other places in

24  Arizona?

25  A     Yes.

Usa v Sutherland, et al 11-20129; 11-20066

                Jury Trial  Vol. XXVIII   12/11/2014
              Lillian George-Direct Examination/Ms. Mohsin

1   Q    Do you have an understanding, approximately, how

2   many chapters or perhaps where those chapters might be

3   located of the Hell's Angels in Arizona?

4        I want to direct your attention, I apologize, to

5   roughly 2003 or the early 2000's.

6   A    To my knowledge, back then, there was about eight

7   chapters in the Phoenix Metropolitan Area.  So that

8   would include Glendale, Tempe, that kind of stuff.

9        Then there were a couple up on the north rim

10  towards the Grand Canyon going into Nevada, Colorado.

11  One in Flagstaff and one in Bullhead City.

12       I'm pretty sure there was one in Kingman, because,

13  again, that goes towards the California side.  And we

14  had two in Tucson.

15  Q    So based upon what you've just described, would it

16  be fair to say you were aware of at least 10 chapters of

17  the Hell's Angels in Arizona at the time?

18  A    Yes.

19  Q    Are you familiar with an individual by the name of

20  Sonny Barger?

21  A    Yes.

22  Q    Do you know who that individual is or was?

23  A    Yes.

24  Q    Who was he or is he?

25  A    Back in the 70's, he was essentially a number one.

              Usa v Sutherland, et al 11-20129; 11-20066

1  He was the President for the Hell's Angels.

2      And though he claims retirement status, he's

3  still -- at least when I was still working, he still had

4  quite a bit of an influence in that club.

5  Q   When you say "that club" you're referring to Hell's

6  Angels?

7  A   I am.

8  Q   Do you have any understanding where he resides?

9  A   Last I heard, he was in Scottsdale, Arizona.

10 Q   Now I want to direct your attention to the Devil's

11 Diciples.

12     You had indicated that that was another club that,

13 during the course of your duties as a law enforcement

14 officer in Pima County, you became aware of.

15     How many chapters were you aware of the Devil's

16 Diciples in Arizona?

17 A   Just Tucson.

18 Q   Just Tucson.  So one chapter?

19 A   Yes.

20 Q   Do you have an understanding of where that

21 Chapter -- withdrawn.

22     Do you have an understanding if there was a club

23 house associated with that chapter?

24 A   Yes.

25 Q   Do you know where it was?

       Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial  Vol. XXVIII   12/11/2014
Lillian George-Direct Examination/Ms. Mohsin

1   A    Yes.  It was on Benson Highway.

2   Q    Isn't that in the City of Tucson itself?

3   A    No.  It's in the county limits.

4   Q    All right.

5        Now directing your attention to the Mongols.

6        You said they were another club that had a presence

7   in Arizona; is that correct?

8   A    As I recall, yes.

9   Q    All right.

10       Were they as significant as the Hell's Angels or to

11  some lesser significance?

12  A    Lesser significance.

13  Q    Then you indicated that there were other smaller

14  clubs that were, perhaps not national clubs; is that a

15  fair statement?

16  A    Yes.

17  Q    So of the motorcycle clubs that you were aware of

18  during your years as a Pima County Law Enforcement

19  Officer, who was the most -- who had the most numbers in

20  the State of Arizona?

21  A    The Hell's Angels.

22  Q    And based upon your experiences, did they have a

23  reputation within the law enforcement community as far

24  as their strength?

25  A    Yes.

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial  Vol. XXVIII   12/11/2014
Lillian George-Direct Examination/Ms. Mohsin

1    Q    What was that reputation?

2    A    Well, specifically, they were known to do a lot of

3    different types of illegal activities.

4         You want me specify?

5    Q    I think I'll be more specific.

6         Were they considered to be a preeminent club?

7    A    Yes.

8    Q    Now -- and was that something that occurred

9    throughout the State of Arizona?

10        In other words, they considered to be the most

11   powerful in Arizona?

12   A    Yes.

13   Q    I want to direct your attention, now, to April of

14   2003.

15        Were you employed by the Pima County Sheriff's

16   Department in April of 2003?

17   A    Yes.

18   Q    And were you a detective?

19   A    I was.

20   Q    And at that time, what was your assignment?  What

21   squad were you in?

22   A    I was in the Robbery-Aggravated Assault.

23   Q    Did there come an occasion where you were called

24   upon to respond to the University Medical Center on,

25   approximately, April 28, 2003?

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial  Vol. XXVIII   12/11/2014
Lillian George-Direct Examination/Ms. Mohsin

1   A    Yes.  It was about 30 minutes.

2        Yeah.  It was about 12:30 in the morning.

3   Q    Of the 28th?

4   A    Of the 28th.

5   Q    So from the night of the 27th into the 28th?

6   A    Yes.

7   Q    Now if someone's involved in a car accident, is

8   that something that you, as a detective in the Robbery

9   Assault Unit, would be called out to investigate?

10  A    No.

11  Q    When would you be called out to investigate

12  something?

13  A    It would have to be at a level of -- it would have

14  to be for, in that particular instance, an aggravated

15  assault of some sort.  Some sort of physical kind of

16  activity occurred.

17  Q    So when you were contacted, what was your

18  understanding about what your purpose was in going to

19  the University Medical Center, you know, around the

20  midnight hours of April 27th into the 28th of 2003?

21  A    There were four individuals that had been located

22  in a very remote area of the desert and brought in for

23  medical treatment.

24       One was actually medevaced in because he was out of

25  consciousness at the time that they actually located

Jury Trial  Vol. XXVIII   12/11/2014
Lillian George-Direct Examination/Ms. Mohsin

1   him.

2       And the injuries that they had received or what had

3   happened out there -- one or two had claimed that there

4   had been a vehicle accident.  However, we didn't find a

5   vehicle.

6       Then one of the persons was saying they'd actually

7   been beaten.

8       So that several of us had gone out to the desert

9   area, as far as my squad, to find a location and do

10  follow up.

11      And then myself and another detective had gone to

12  do the hospital follow up and get statements from these

13  victims that were at the hospital.

14  Q   So at the time that you were contacted or to go the

15  hospital, had four individuals already been found in the

16  desert?

17  A   Yes.

18  Q   And did you arrive at the University Medical

19  Center?

20  A   I did.

21  Q   Is there a Level One Trauma Center at that

22  particular hospital?

23  A   Yes.

24  Q   And was that the only Level One Trauma Center at

25  the time in the Tucson area?

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial   Vol. XXVIII   12/11/2014
Lillian George-Direct Examination/Ms. Mohsin

1   A   Yes.

2   Q   When you arrived there, what did you do first?

3   A   I got a briefing from the deputy that was there,

4   which was pretty vague.

5       And -- but he, he indicated that there the four

6   that were there were in different locations.

7       The one that had been unconscious had been

8   intubated, so there was no way to get a statement from

9   this individual.  And he had still not gained

10  consciousness at the time.

11      So where they were located in the trauma area is

12  where I went to go and speak with these folks.

13  Q   So when you arrived, you became aware that one of

14  the four individuals was unconscious and intubated?

15  A   Correct.

16  Q   So you were not able to speak with him?

17  A   Correct.

18  Q   Did you have conversations with a doctor about his

19  condition?

20  A   I'm sure it was the doctor.  But yes, yes.

21      He stated that there was just -- they were trying

22  to keep him alive and figure out what was broken with

23  him.  But it appeared that he had received head trauma.

24  Q   Now did you have an opportunity to, at some point,

25  to take any photographs of this individual?

Usa v Sutherland, et al 11-20129; 11-20066

                    Jury Trial   Vol. XXVIII   12/11/2014
                    Lillian George-Direct Examination/Ms. Mohsin

 1   A    Yes.

 2   Q    I want to direct your attention, though, to what

 3   you did after you were unable to speak with him.

 4        By the way, what was his name, the one was

 5   intubated?

 6   A    His name was Ray McCoskey.

 7   Q    And did he have a nickname you later determined

 8   through the investigation?

 9   A    Yes.

10   Q    What was that nickname?

11   A    Golf Clubs.

12   Q    And so after you attempted to speak with Ray

13   McCoskey or Golf Clubs, what did you do next?

14   A    I then began interviewing and speaking with the

15   other victims that were at the Trauma Center.

16   Q    And among those victims, who did you try to speak

17   with first?

18   A    That was Charlie Riggs or Higgins.  He goes by the

19   nickname of Riggs.

20   Q    And did you have somewhat of a conversation with

21   him?

22   A    Yes.

23   Q    Did you have any conversation with any of the other

24   victims?

25   A    Yes.

Jury Trial  Vol. XXVIII   12/11/2014
Lillian George-Direct Examination/Ms. Mohsin

1  Q    Who else?

2  A    I spoke with Michael Towner also known as "Two

3  Dogs" and John Fournier, also known as "Johnny Old

4  School".

5  Q    And did there come a time where you received

6  information that caused you to take additional

7  investigative steps and I want to direct your attention

8  too the Box Canyon.

9       Did there come a time based on your discussions

10 with them you had to take any or your team had to take

11 any investigative steps in the Box Canyon?

12 A    Yes.

13 Q    What were those steps?

14 A    "Johnny Old School" had advised me that there had

15 actually been five victims.

16      So that if we hadn't found any other victims or

17 they weren't at the hospital, that this person might

18 actually be dead in the canyon.

19      So we had Search and Rescue come out and look and

20 we had helicopters go over and try to find a heat

21 signature, the whole shebang.

22 Q    After you had these conversations with these

23 individuals, did there come a time where you took

24 photographs of their injuries?

25 A    Yes.

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial  Vol. XXVIII    12/11/2014
Lillian George-Direct Examination/Ms. Mohsin

1    Q    And were -- was there any particular reason why you

2    took certain photographs?

3    A    Yes.

4    Q    What did you observe of each of these victims?

5        And what was the reason why you wanted to take

6    photographs?

7    A    What I had observed -- Charlie Riggs or Higgins, is

8    about 6 foot 5.

9        I don't know if you've seen a hospital gurney, but

10   they're not that tall, they're not that long.

11       So his feet are hanging off the side and he has no

12   boots.  His feet are bloody and bruised.  He's not --

13   he's bloodied up all over.  He's not wearing a shirt.

14       And it was, it was just odd, because I knew who he

15   was from my years of experience in patrol.

16       Same thing with "Two Dogs".  He didn't have his

17   clothing with him.  And he was just as disheveled.

18       From my training and experience, we, we were taught

19   to look for pattern injuries.

20       "Johnny Old School" was telling me that they had

21   been beaten with baseball bats and with brass knuckles

22   and just, just bludgeoned, essentially.

23       And the injuries I took photographs of were

24   indicative to have that type of sort of injury, not with

25   a roll over, unless there were rocks in the car.  And

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial  Vol. XXVIII   12/11/2014
Lillian George-Direct Examination/Ms. Mohsin

1   there was no car.

2   Q    So I want to direct your attention now to the

3   photographs.

4        Prior to testifying here today, did you have a

5   chance to look at some photographs with exhibit stickers

6   on them?

7   A    I did.

8   Q    Did you recognize those photographs?

9   A    I did.

10  Q    Did you recognize those photographs as photographs

11  you had taken?

12  A    And the hospital.

13  Q    Were they contemporaneous with the injuries as you

14  observed them?

15  A    Yes.

16  Q    All right?

17       MS. MOHSIN:  One moment, please.

18

19                 (After a short delay, the

20                 proceedings continued)

21

22       MS. MOHSIN:  Your Honor, I believe there's no

23  objection.

24       I'm going to move for admission of certain

25  photographs as follows:  11-33, 11-34, 11-36, 11-38,

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial  Vol. XXVIII   12/11/2014
Lillian George-Direct Examination/Ms. Mohsin

1   through 42 inclusive.

2        11-52, 11-54, 11-55, 11-57, 11-58, through 65

3   inclusive.

4        11-67, 11-68, 11-70 through 11-78 inclusive.

5             THE COURT:  That's it?

6             MS. MOHSIN:  Yes, Your Honor.

7             THE COURT:  Without objection?  Hearing none,

8   each is received.

9             MS. MOHSIN:  Yes, Your Honor.

10  BY MS. MOHSIN:

11  Q    Mrs. George, I would like to direct your attention

12  to Government Exhibit 11-33.  It's going be put up on

13  this large screen as well as to the screen next to you.

14  To the extent the screen is not sufficiently clear, I

15  would ask you look at the larger one.

16       Do you recognize this photo?

17  A    Yes.

18  Q    How did you recognize it?

19  A    I took it.

20  Q    And who's depicted?

21  A    "Johnny Old School".

22  Q    Is this what he looked like when you first saw him?

23  A    Yes.

24  Q    Directing your attention to 11-34.  Did you take

25  that photo?

Jury Trial  Vol. XXVIII  12/11/2014
Lillian George-Direct Examination/Ms. Mohsin

1    A    Yes.

2    Q    There's a laser pointer next to you.  I would ask

3    if you could identify if there's anything about this

4    particular photo that caused you to take it.

5    A    Other than the facial injuries that were in the

6    first photograph, right here on his left ribcage area,

7    there is -- they're scratches and abrasions which are

8    consistent with a falling sort of occurrence.

9        But he -- there's also -- and it's hard to see in

10   this photograph.  But there is a pattern injury right

11   along here, from what would be consistent with a

12   baseball bat.

13   Q    All right.  Directing your attention now to 11-35.

14   Is there a reason why you took this particular photo?

15   A    Yes.  Right.  Obviously, there's, there's signs of

16   injury here to his left eye.

17       He informed me later on that his orbital had been

18   cracked.

19       But right along the temple right here, that injury

20   was pretty significant because there was actually a

21   goose egg coming out from that injury, which is

22   consistent with a really hard blow to the head.

23       He stated he'd been in and out of consciousness

24   after the assault against him and then once he'd been

25   thrown down into the ravine.

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial   Vol. XXVIII   12/11/2014
Lillian George-Direct Examination/Ms. Mohsin

1   Q    Directing your attention to 11-36.

2        Could you tell the jury why you took this

3   particular photo?

4   A    It just indicates the top of his head.

5        There's also this, this injury right to the top of

6   his head, which could have been from the blow.

7   Q    11-37.  Same question.

8   A    It's to show the bruising around his eye and the

9   blood over his right temple.

10  Q    11-38.

11  A    Okay.  I would direct you to his knee as well as

12  his shin.

13       He had indicated that they'd struck him with a

14  baseball bat or hard object across his knees and his

15  shins as well as his feet.

16  Q    11-39.

17  A    This is a photograph indicating the left and right,

18  primarily the left leg.

19       So, again, there's the bruising right here across

20  the knees.

21       And as I recall, he indicated that he'd been in a

22  seated position when they struck him across the

23  kneecaps.

24  Q    11-40.

25  A    I was in particular taking that photograph because

Jury Trial  Vol. XXVIII   12/11/2014
Lillian George-Direct Examination/Ms. Mohsin

1   that tattoo is right there which has many different

2   variables if you ask anybody.

3   Q    That's something you've seen in connection with

4   members of motorcycle clubs?

5   A    Yes.

6   Q    All right.  Directing your attention to 11-41.

7   A    So this was consistent with his statement of being

8   struck by a hard object on his feet.

9        Again, the lighting in the hospitals are terrible,

10  but right here is -- across the face of his right foot

11  is a contusion, a bruising coming up.  I mean it was a

12  pretty good goose egg coming up.

13       I took a different photograph and angles of that.

14  That was a fresh bruise.

15  Q    11-42?

16  A    Same foot as the right foot facing from the arch

17  outward.

18  Q    I want to direct your attention to the next series

19  of photographs 11-44.

20       Do you recognize that individual?

21  A    Yes.  That's Charlie Higgins.

22  Q    All right.  11-40.

23       Anything about this photograph you want to point

24  out before we move to the next one?

25  A    No.  He had complained that he had also passed out.

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial  Vol. XXVIII   12/11/2014
Lillian George-Direct Examination/Ms. Mohsin

1   He was in that same collar, so it was hard for him to

2   move his head.

3   Q     11-45.

4   A     I was just making sure I could take tattoos of him

5   (sic).

6   Q     11-46.

7   A     So the cuts on the pants -- if any of you know or

8   could see on television, they actually cut the clothing

9   off to see what type of injuries they have.

10        But he had a pretty good laceration and avulsions

11   from falling down into the ravine, according to his

12   statement.

13   Q     11-47.

14   A     Again, there's an injury right on the elbow, on the

15   crown of the elbow right here.

16   Q     Is that why you took the photo?

17   A     I did.

18   Q     11-48.

19   A     Right along his left ribcage, it's smeared with

20   dirt and blood.

21        But there also appeared to be a pattern injury

22   there consistent with something hard striking him hard

23   and long.

24   Q     Directing your attention to 11-49.

25   A     Just another depiction of the tattoos that he had

Jury Trial  Vol. XXVIII   12/11/2014
Lillian George-Direct Examination/Ms. Mohsin

1   on his body.

2   Q    11-50.

3   A    This is consistent with the information that we'd

4   received from "Johnny Old School".  They'd beaten them

5   with the baseball bats or hard objects on the feet.

6        And there was, there was an enormous pooling of

7   blood here as well as around here, so there's some edema

8   going on.

9   Q    Is that why you took that photo?

10  A    Yes.  If you look at the right kneecap, it's also

11  significantly bruised.

12  Q    11-52.

13  A    These are the soles, soles of Mr. Higgins' foot.

14  He had no boots at all.

15  Q    Directing your attention, now, to the next series

16  of photographs 11-54.

17       Do you recognize this photo?

18  A    Yes.

19  Q    Did you take that photo -- series of photos as

20  well?

21  A    I did.

22  Q    Who's that?

23  A    Mr. McCoskey, the gentleman that was intubated.

24  Q    And the people with the lights?

25  A    Those are reflectors.  That's the flight crew that

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial  Vol. XXVIII   12/11/2014
Lillian George-Direct Examination/Ms. Mohsin

1    brought him in.

2    Q    11-55.

3    A    Same.

4    Q    Mr. McCoskey?

5    A    It is.

6         What I was depicting were the markings on the

7    sole -- soles of his feet or balls of his feet which are

8    dirty and they had cactus  in them.

9         So I couldn't get too close to these folks because

10   I had all medical treatment going on around them.  But I

11   wanted to capture as much of the photographs as I could.

12        Again, he didn't have any clothing with him either.

13   Q    11-56.  Who's that?

14   A    That's Mr. McCoskey on his left side.

15   Q    All right.  Anything significant you want to

16   identify about the photo?

17   A    I noticed that there's a bruising here on his

18   shoulder and -- yes.

19        On the left temple right here, so across the bone

20   just to, to the side of the temple.  So along the

21   orbital.

22   Q    Okay.  11-57.

23        Anything significant about that photo?

24   A    Just another view same area.

25   Q    Do you have more limited photos of Mr. McCoskey

Usa v Sutherland, et al 11-20129; 11-20066

Jury Trial  Vol. XXVIII   12/11/2014
Lillian George-Direct Examination/Ms. Mohsin

1  then you had wanted?

2  A    Yes.

3  Q    Was that because of the medical personnel?

4  A    And because of his medical condition, they were

5  struggling to hold onto him.

6           THE COURT:  We'll take our morning recess, 20

7  minutes in the jury room, ladies and gentlemen.

8  Resuming in 20 minutes.  Thank you.

9

10      (Whereupon court was in recess at 10:50 a.m.)

11

12

13

14

15           CERTIFICATE OF COURT REPORTER

16

17

18

19    I certify that the foregoing is a correct transcript

20    from reported proceedings in the above-entitled

21    matter.

22

23

24

25  s/Carol S. Sapala, FCRR, RMR     December 11, 2014

Usa v Sutherland, et al 11-20129; 11-20066